[No. B019246. Second Dist., Div. One. Nov. 17, 1987.]

NO OIL, INC., et al., Plaintiffs and Appellants, v.
CITY OF LOS ANGELES, Defendant and Appellant;
OCCIDENTAL PETROLEUM CORPORATION, INC., Real Party
in Interest and Appellant.

RICHARD D. WEISMAN et al., Plaintiffs and Respondents, v.
CITY OF LOS ANGELES, Defendant and Appellant;
OCCIDENTAL PETROLEUM CORPORATION, INC., Real Party
in Interest and Appellant.

COUNSEL

Burke, Williams & Sorensen, Colin Lennard, John W. Belsher, Carol A. Schwab, Lisa E. Krantz, Steven A. Drown, Kevin S. Mills and John B. Murdock for Plaintiffs and Appellants.

Robert M. Myers, City Attorney (Santa Monica), and Joseph Lawrence, Assistant City Attorney, as Amici Curiae on behalf of Plaintiffs and Appellants.

James K. Hahn, City Attorney, Gary R. Netzer and Edward C. Dygert, Assistant City Attorneys, William L. Waterhouse and William F. Childs, Deputy City Attorneys, for Defendant and Appellant.

Gibson, Dunn & Crutcher, William French Smith, Robert S. Warren, Joel S. Moskowitz, Mitchell, Silberberg & Knupp, Arthur Groman, Sanders Barnet, Jacobsen, Goldman & Mosk, Richard M. Mosk, Manatt, Phelps, Rothenberg, Tunney & Phillips, Maria Hummer, David Elson and Clare Bronowski for Real Party in Interest and Appellant.

Hecht, Diamond & Greenfield and Roger Jon Diamond for Plaintiffs and Respondents.

## OPINION

**DEVICH, J.**—This appeal presents several questions concerning the validity of three ordinances (sometimes hereafter referred to as drilling ordinances) which permit exploratory oil drilling and, should that prove successful, transportation of the oil by pipeline.

Occidental Petroleum Corporation (hereafter Occidental) and City of Los Angeles (hereafter City) appeal from a judgment granting a writ of mandate commanding the setting aside of the drilling ordinances enacted by the Los Angeles City Council (hereafter City Council), enjoining any activity dependent upon these ordinances, and returning the matter to City Council for clarification of certain findings. No Oil, Inc. (hereafter No Oil), Pacific

Palisades Residents Association, Inc. (hereafter Pacific), and Malibu Township Council, Inc. (hereafter Malibu), cross-appeal from the same judgment.[1]

We conclude that the discussion of the environmental effects of the proposed pipeline contained in the environmental impact report (hereafter EIR) satisfies the requirements of the California Environmental Quality Act (Pub. Resources Code, § 21000 et seq.,[2] hereafter CEQA); that the findings adopted by City Council pursuant to section 21081 are not in need of clarification; that the drilling ordinances are consistent with City's general plan; and that the indemnity agreement provided as a condition of the drilling ordinances is valid. We therefore reverse the judgment.

PROPOSED PROJECT

The project proposed by Occidental is described in the summary to the final EIR prepared in August 1982 as follows: "Occidental Petroleum is seeking supplemental use districts to permit the following uses and activities: [¶] The drilling of two exploration wells on an approximate 1/2-acre portion of a 2-acre site at one of the following locations: [¶] 15147 Pacific Coast Highway or [¶] 146 Entrada Drive;[3] [¶] The establishment of three oil drilling districts comprising a total of 594 acres; [¶] The development of a permanent drilling and production facility on approximately 2 acres at one of the above locations. [¶] The permanent drilling and production site would contain a single 155-foot oil derrick and up to 60 oil and natural gas wells to tap pools estimated at 10,000 feet below the earth's surface. Occidental estimates that the pools contain between 25 and 60 million barrels of oil and between 50 and 120 billion cubic feet of natural gas. [¶] The derrick will be mobile, mounted on a track to allow placement of the structure over each of the drilling locations (wells), located in a subsurface well cellar." (Italics omitted.)

ADMINISTRATIVE AND LEGISLATIVE HISTORY OF THE ORDINANCES

The drilling ordinances were the result of a long administrative and legislative process, the highlights of which are provided here for purposes of background.

On October 16, 1980, Occidental submitted an environmental assessment form to the city planning department seeking the establishment of three oil

---

[1] Occidental and City will sometimes collectively be referred to as "appellants" or "cross-respondents" while No Oil, Pacific, and Malibu will sometimes collectively be referred to as "respondents" or "cross-appellants."

[2] Unless otherwise stated, all statutory references are to the Public Resources Code.

[3] The Entrada Drive location has been dropped from consideration.

drilling districts and the designation of a drill site in the Pacific Palisades area.

City determined that an EIR was required pursuant to the dictates of CEQA. A draft EIR was circulated and comments regarding the project were received. In August 1982, the final EIR was certified as complete.

After conducting a public hearing on November 4, 1982, the City planning commission denied Occidental's application based on findings relating to the proposed project's adverse effect on slope stability and the potential liability of City.

Occidental appealed the City planning commission's decision to City Council. The planning and environment committee of City Council determined that a supplemental EIR was required regarding Occidental's proposed dewatering program aimed at slope stabilization. A final supplemental EIR was prepared in March 1984. On May 1, 1984, the planning and environment committee accepted the recommendations contained in the supplemental EIR regarding slope stability and requested City to draft a waiver and indemnity agreement with respect to potential City liability on account of the dewatering program. The planning and environment committee voted to approve the drilling ordinances on June 5, 1984. The appeal was then considered by the entire City Council which voted on July 6, 1984, to grant Occidental relief.

Pursuant to Los Angeles City Charter section 97.2, the proposed drilling ordinances were considered by the City planning commission. After conducting a public hearing, the City planning commission voted to disapprove the proposed ordinances on October 4, 1984. Occidental appealed to City Council.

City Council conducted a public hearing regarding the proposed ordinances on December 12, 1984. The ordinances were adopted by City Council on January 8, 1985, and signed by Mayor Tom Bradley on January 12, 1985.

PROCEEDINGS IN THE TRIAL COURT

On February 7, 1985, Richard and Veda Weisman (hereafter the Weismans) filed a petition for writ of mandate pursuant to Code of Civil Procedure section 1085 seeking to invalidate the ordinances.[4] A separate petition for writ of mandate and complaint for declaratory and injunctive relief was

---

[4] The Weismans appear in this appeal solely as respondents.

filed by No Oil and Pacific the same day.[5] Upon Occidental's motion, the cases were consolidated.

After hearing argument, the trial court rendered its statement of decision on September 17, 1985. The trial court concluded that, since there were only four possible pipeline routes contemplated by the project, the EIR should have contained a detailed description of the environmental effects of each route. The trial court further found that two of City Council's findings in support of the ordinances regarding slope stability and fire protection contained inconsistencies. The trial court continued the matter for further briefing and argument regarding the appropriate remedy.

On February 21, 1986, the trial court signed a judgment granting a writ of mandate commanding City Council to set aside the drilling ordinances and any permits or authorizations granted pursuant to them, enjoining any oil drilling activity dependent upon the ordinances, and returning the matter to City Council for clarification of its findings regarding slope stability and fire protection.

### ISSUES

On appeal, Occidental and City contend that the EIR's discussion regarding the pipeline satisfied the requirements of CEQA; that, assuming the pipeline discussion was inadequate, the remedy imposed by the trial court was excessive; and that City Council's findings were not inconsistent.

In their cross-appeal, No Oil, Pacific, and Malibu contend that the drilling ordinances are inconsistent with City's general plan and that the indemnity agreement provided as a condition of the ordinances is void.

### DISCUSSION

I. The Appeal

A. Compliance With CEQA

1. Was the EIR Adequate?

 Appellants contend that the EIR's discussion regarding the pipeline satisfied the requirements of CEQA. Respondents counter this contention by arguing that City Council failed to comply with CEQA when it

---

[5] An amended petition for writ of mandate and complaint for declaratory and injunctive relief adding Malibu as a petitioner and plaintiff was filed on March 6, 1985.

approved the project without requiring a full-scale EIR of the pipeline and all of its potential routes.[6]

██ "Consideration of an EIR's adequacy is a judicial function. [Citation.] Judicial inquiry . . . is limited to the question of abuse of discretion, which is established if the agency has not proceeded as required by law or its decision is not supported by substantial evidence. (*No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68, 74 [118 Cal.Rptr. 34, 529 P.2d 66]; § 21168.5.) Courts do not pass upon the correctness of an EIR's environmental conclusions but only upon its sufficiency as an informative document [citation]." (*City of Poway* v. *City of San Diego* (1984) 155 Cal.App.3d 1037, 1041, fn. omitted [202 Cal.Rptr. 366].)

In *Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397 [151 Cal.Rptr. 866], an oil company's application for a conditional use permit to drill an exploratory oil and gas well was granted despite the EIR's failure to discuss the environmental effects of a contemplated pipeline. After holding that the EIR inadequately discussed the cumulative environmental impact of the project (*id.,* at p. 411), the court stated: "The record before us reflects that the construction of a pipeline was, from the very beginning, within the contemplation of Phoenix should its well prove productive. Although admittedly contingent on the happening of certain occurrences, the pipeline was, nevertheless, part of Phoenix' overall plan for the project and could have been discussed in the EIR *in at least general terms.*" (*Id.,* at pp. 414-415, fn. omitted, italics added.)

In the case at bench, since it is conceded that any oil extracted for production will be transported by pipeline, the EIR must, at a minimum, contain some discussion of the pipeline's effects if it is to satisfy CEQA's requirements.

---

[6]Appellants contend that respondents were precluded from attacking the adequacy of the EIR in the trial court on the basis of the EIR's failure to make a comparative assessment of the environmental impacts of each of the proposed alternative pipeline routes because respondents did not specifically address this issue within the time period provided for comments to the draft EIR. (See, generally, Cal. Admin. Code, tit. 14, § 15088, a part of the guidelines for the implementation of CEQA which will hereafter be referred to as Guidelines.)

Initially, we note that appellants misconstrue the trial court's ruling. As noted above, the trial court did not rule that the EIR was defective solely because it did not make an "explicit comparison" of each alternative pipeline route against the others. Rather, the trial court concluded that, since there were only four possible pipeline routes contemplated by the project, a detailed description of the environmental effects of each route should have been contained in the EIR.

Secondly, the administrative record reveals that comments concerning the draft EIR timely lodged by the public, particularly a 33-page letter sent by Pacific on April 9, 1982, addressed the draft EIR's purportedly inadequate treatment of the pipeline's environmental effects.

Guidelines section 15151 provides, in pertinent part: "An EIR should be prepared with a sufficient degree of analysis to provide decisionmakers with information which enables them to make a decision which intelligently takes account of environmental consequences. An evaluation of the environmental effects of a proposed project need not be exhaustive, but the sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible." (See also *San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100].) ▮ The question thus becomes whether the EIR's discussion of the pipeline provided City Council with enough details to permit an environmentally informed decision.

The draft EIR discussed the pipeline in terms of construction noise, risk of upset, mitigation measures, and impact on traffic and aesthetics.

The final EIR contained a section responding to comments received regarding the draft EIR. Addressing Pacific's comment concerning the draft EIR's pipeline discussion, the final EIR set forth a description of each route's destination, the uses of the land that the pipeline would cross, the schools located along the route, the public entities from which a permit would be required, and the pipeline construction's effect on traffic.

▮▮▮▮ In response to other comments, the final EIR addressed, inter alia, concerns regarding the rate at which the pipeline could be constructed, the risk of polluting the City of Santa Monica's (hereafter Santa Monica)[7] water supply, dust and vehicle emissions caused by pipeline construction, and the risk of spills, fires and explosions.[8]

▮ Respondents contend that the EIR failed to fully analyze the location, extent, and environmental impacts of the contemplated pipeline routes.

In *Big Rock Mesas Property Owners Assn.* v. *Board of Supervisors* (1977) 73 Cal.App.3d 218 [139 Cal.Rptr. 445], the petitioners attempted to set

---

[7] We find amicus Santa Monica's contentions that the EIR failed to provide good faith and reasoned responses to public comments, that the EIR failed to acknowledge Santa Monica's discretionary authority over one of the proposed routes, and that the EIR did not adequately discuss the risk of contamination, to be without merit.

[8] Santa Monica argues that "[t]he EIR also includes an ominously one-sided analysis of the safety implications of joining the proposed pipeline to an existing Shell pipeline in the City of Santa Monica." Santa Monica faults the draft EIR for relying on a February 1982 analysis of the Shell pipeline prepared by Bechtel Petroleum, Inc., without making reference to some of the contradictory conclusions contained in a February 1981 study prepared by John Mastandrea on behalf of NDE Technology, Inc. However, we note that the Mastandrea study was not submitted until after both the final and final supplemental EIRs were certified as complete. Since there was no showing that the information contained in the Mastandrea study was not and could not have been known at the time the EIR was certified as complete, a supplemental EIR discussing the new matter was not required. (§ 21166, subd. (c).)

aside the approval of a tentative tract map for a proposed residential development. "[T]he proposed development consist[ed] of two stages—phase I, involving 174 improved residential lots on 531 acres, and phase II, involving 168 improved residential lots on 886 acres." (*Id.,* at p. 221.) Addressing the petitioners' contention that the EIR failed to discuss "'alternatives to the enormous amount of grading and the filling and construction of an unlawfully steep access road in a natural canyon'" (*id.,* at pp. 226-227), the court held: "The pertinent statute and EIR guidelines require that an EIR describe alternatives to the proposed *project.* . . . We interpret such requirement as applicable only to the project as a whole, not to the various facets thereof, such as grading and access roads. Thus, contrary to petitioners' contention, the EIR herein is not deficient for its failure specifically to describe alternatives to the amount of grading proposed for the project, and alternatives to the location and character of the proposed access road (A Street). The EIR discusses in detail the mitigating measures to be taken in minimizing the impact of the grading and the access road. It also discusses alternatives to the project in its entirety. The law requires no more." (*Id.,* at p. 227, fns. omitted, original italics.)

Like the access road in *Big Rock,* the pipeline in the case at bench is a single facet of a large project. Thus, while the EIR had to contain a discussion of the pipeline's environmental effects, there was no need to discuss every potential route the pipeline may take.

Respondents and amicus Santa Monica argue that deferment of analysis of the pipeline's environmental effects improperly fragments the project and that, once a large amount of capital has been expended in the exploratory phase,[9] the production phase will be virtually assured of approval regardless of its environmental consequences.

In *Big Rock,* the petitioners contended that the EIR failed to adequately address phase II of the proposed project. After citing former Guidelines section 15069[10] (see present Guidelines, § 15165) and quoting pertinent

[9] The determination of conditions and methods of operation, approved by City's board of referred powers on May 6, 1986, of which this court has taken judicial notice (see fn. 20, *post,* at p. 246), sets forth the manner by which Occidental is to proceed with this project. According to this document, Occidental must conform to the following development sequence: Phase number I, part 1—conditions precedent to drilling of the two confirmation wells; phase number I, part 2—drilling of two confirmation wells; phase number III—drilling and production. Furthermore, Occidental may not enter a new phase until City's zoning administrator approves the satisfactory fulfillment of all conditions contained in the previous phase.

[10] Former Guidelines section 15069 provided: "Where individual projects are, or a phased project is, to be undertaken and where the total undertaking comprises a project with significant environmental effect, the Lead Agency must prepare a single EIR for the ultimate project. Where an individual project is a necessary precedent for action on a larger project, or commits the Lead Agency to a larger project, with significant environmental effect, an EIR must address itself to the scope of the larger project. Where one project is one of several simi-

portions of the EIR, the court stated: "It is apparent that, at the time the EIR was prepared, there was a firm commitment to develop only phase I of the proposed project. Insofar as development of the entire project (phases I and II) is contingent on the prior completion of phase I, the EIR adequately addresses itself to the scope of the entire project, as required by section 15069." (*Id.,* at p. 228.)

In *Sierra Club* v. *Morton* (5th Cir. 1975) 510 F.2d 813, the plaintiffs attacked the adequacy of an environmental impact statement (hereafter EIS) prepared, pursuant to the National Environmental Policy Act (42 U.S.C. § 4321 et seq.),[11] in conjunction with the Department of Interior's sale of oil and gas leases to 147 tracts of the federally owned Outer Continental Shelf. The EIS contained a general discussion of the environmental problems that would result from the construction of a pipeline but deferred the preparation of an in-depth EIS until it was determined that one was required. The plaintiffs alleged that the EIS improperly fragmented the project and "by gaining acceptance of some parts, compel acceptance of the whole." (*Id.,* at pp. 823-824, fn. omitted.) The court rejected this argument, stating: "This project is an easily divisible one. In this continuously controllable project, the fact that a tract may prove productive would not mandate that an unsound method of delivering that production be utilized. We are not unmindful of the rule that the sufficiency of an EIS must be determined without reference to *possible* future action. Today's statement, however, includes sufficient pre-statement analysis of possible environmental hazards from pipeline location, construction or leakage." (*Id.,* at p. 824, original italics.)

Similarly, in *County of Suffolk* v. *Secretary of Interior* (2d Cir. 1977) 562 F.2d 1368, the plaintiffs sought to enjoin the proposed leasing to private industry of portions of the Outer Continental Shelf for oil and gas exploration. The EIS prepared for the project deferred a detailed consideration of the environmental effects of a pipeline until a lessee discovered oil and sought approval of a specific pipeline route. In rejecting the plaintiffs attack upon this deferment, the court stated: "In our view the answer, and the extent to which treatment of a subject in an EIS for a multistage project may be deferred, depends on two factors: (1) whether obtaining more detailed useful information on the topic of transportation is 'meaningfully possible' at the time when the EIS for an earlier stage is prepared, [citation], and (2) how important it is to have the additional information at an earlier

---

lar projects of a public agency, but is not deemed a part of a larger undertaking or a larger project, the agency may prepare one EIR for all projects, or one for each project, but shall in either case comment upon the cumulative effect."

[11] Judicial and administrative interpretation of the National Environmental Policy Act is persuasive authority when considering CEQA issues since CEQA was modeled after the federal statute. (*No Oil, Inc.* v. *City of Los Angeles, supra,* 13 Cal.3d at p.86, fn. 21.)

stage in determining whether or not to proceed with the project [citation]. [¶] If the additional information would at best amount to speculation as to future event or events, it obviously would not be of much use as input in deciding whether to proceed. . . . Where the major federal action under consideration, once authorized, cannot be modified or changed, it may be essential to obtain such information as is available, speculative or not, for whatever it may be worth in deciding whether to make the crystalized commitment . . . . But where a multistage project can be modified or changed in the future to minimize or eliminate environmental hazards disclosed as the result of information that will not become available until the future, and the Government reserves the power to make such a modification or change after the information is available and incorporated in a further EIS, it cannot be said that deferment violates the 'rule of reason.' Indeed, in considering a project of such flexibility, it might be both unwise and unfair not to postpone the decision regarding the next stage until more accurate data is at hand." (*Id.,* at p. 1378, fn. omitted.)

In the case at bench, information presented to the planning and environment committee of City Council, which became part of the administrative record, indicates that until the quantity and quality of the oil extracted during the exploration phase is analyzed, Occidental will not know whether it is financially desirable to proceed with the project, where the oil will be transported, or the specifications of the pipeline to be constructed. Until the oil is analyzed, any in-depth discussion of the proposed pipeline would be mere speculation.

Furthermore, since Occidental has already been granted a franchise (L.A. City Ord. No. 138944), authorization of a specific route for the pipeline will be granted, if at all, only upon consideration by City's board of transportation. (L.A. City Charter, § 3; L.A. City Admin. Code, div. 13, ch. 1, art. 4, §§ 13.11-13.14.) An EIR containing a detailed analysis of the environmental effects of the specific proposed route will be prepared at that time. Should the unmitigated adverse environmental effects of the proposed pipeline route outweigh the benefits to be obtained, approval of the pipeline would be withheld at that time.

Thus, the EIR in the case at bench properly deferred an in-depth consideration of the environmental effects of each proposed pipeline route until such time as a marketable amount of oil is verified to exist and an application for approval of a pipeline is presented to the board of transportation.

Upon our review of the EIR, CEQA, its Guidelines and the applicable cases, we conclude that the EIR adequately informed City Council of the environmental risks associated with the entire project including the pipe-

line. A detailed environmental analysis of each potential route the pipeline might take was not necessary at this stage. We therefore hold the trial court erred in concluding that such an analysis was required.[12]

2. Are City Council's Findings of Overriding Considerations Supported by Substantial Evidence?

■ The Weismans contend that unless an exploratory core hole[13] is drilled, a substantial basis cannot exist in the administrative record to support City Council's finding that "social, economic or environmental benefits of the subject project will outweigh its environmental cost' and will justify approval of the requested Oil Drilling Districts."[14]

The Weismans rely heavily on a report by E. D. Michael, a consulting geologist hired by No Oil. In his report, which was attached as an appendix to the March 1984 final supplemental EIR, Michael characterized the anticipated oil reserve as nothing more than optimistic speculation. However, Michael was not the only expert to provide an opinion regarding the existence of an oil reserve. Opinions in support of the existence of an oil reserve were provided by Donald Collins, a geologist employed by Occidental; Ted

---

[12] In light of our holding that the EIR was adequate, we need not reach the contention that the trial court imposed an excessive remedy.

[13] We note that the project proposed by Occidental does not involve the drilling of exploratory core holes. Rather, it involves the drilling of exploratory wells. The distinction between the two procedures was explained in *Brentwood Assn. for No Drilling, Inc.* v. *City of Los Angeles* (1982) 134 Cal.App.3d 491, 495, footnote 2 [184 Cal.Rptr. 664].

[14] The first "overriding consideration" (Guidelines, § 15093) contained in City Council's findings stated: "If successful, the project will yield substantial economic benefit to the City and County of Los Angeles, the school district, special districts and private landowners within the proposed drilling districts. The project could ultimately uncover an oil field of anywhere between 25 million barrels with 50 million Mcf of natural gas to a field of 60 million barrels of oil with 120 million Mcf of natural gas. Assuming a selling price of $30 per barrel for oil and a selling price of $3.00 per thousand cubic feet of natural gas, average annual revenues for the first five years of production are as follows:

| | "25 Million BBI & Natural Gas | 60 Million BBI & Natural Gas |
|---|---|---|
| "City Property Taxes | $ 411,000 | $ 985,000 |
| "School District Property Taxes | 925,000 | 2,219,000 |
| "Special District Property Taxes | 73,000 | 175,000 |
| "County Property Taxes | 635,000 | 1,524,000 |
| "City Business License Taxes | 32,000 | 77,000 |
| "Utility Users Taxes | 102,000 | 153,000 |
| "Pipeline Franchise Taxes | 2,000 | 2,000 |
| "City Royalties | 664,000 | 1,594,000 |
| "County Royalties | 62,000 | 149,000 |
| "School District Royalties | 81,000 | 194,000 |
| "Annual Total | $2,987,000 | $7,072,000" |

Bear, an engineering geologist; R. K. Baker, senior oil and gas engineer for the California Department of Conservation's Division of Oil and Gas; and Jeffrey Druyun, principal administrative analyst for city's administrative officer.

Thus, City Council was presented with a conflict between the opinions of the experts. "Where, as here, the evidence was conflicting, the City Council was permitted to give more weight to some of the evidence and to favor the opinions and estimates of some of the experts over the others." (*Greenbaum v. City of Los Angeles* (1984) 153 Cal.App.3d 391, 413 [200 Cal.Rptr. 237]; see also Guidelines, § 15151.)

We therefore conclude that City Council's findings of overriding considerations are supported by substantial evidence.

B. Adequacy of the Section 21081 Findings

City Council adopted findings pursuant to section 21081.[15] In reviewing the challenges made to these findings, the trial court concluded that two of the findings, regarding slope stability and fire protection, contained inconsistencies and returned the matter to City Council for clarification. (See *Keeler v. Superior Court* (1956) 46 Cal.2d 596, 600 [297 P.2d 967]; *No Oil, Inc. v. City of Los Angeles* (1974) 13 Cal.3d 68, 81 [118 Cal.Rptr. 34, 529 P.2d 66].) Occidental and City contend that any inconsistencies in the findings are clarified when read in conjunction with the EIR and the drilling ordinances. We agree.

1. Slope Stability

In its findings, City Council recognized "[t]hat the Via de las Olas 1957 landslide to the northeast of the recommended drill site will be susceptible to further failure if the groundwater rises to 80 feet below the surface grade of the slide mass," but concluded that this environmental risk could be mitigated to a level of insignificance by way of several measures including

---

[15] Section 21081 provides: "Pursuant to the policy stated in Sections 21002 and 21002.1, no public agency shall approve or carry out a project for which an environmental impact report has been completed which identifies one or more significant effects thereof unless such public agency makes one, or more, of the following findings: [¶] (a) Changes or alterations have been required in, or incorporated into, such project which mitigate or avoid the significant environmental effects thereof as identified in the completed environmental impact report.

"(b) Such changes or alterations are within the responsibility and jurisdiction of another public agency and such changes have been adopted by such other agency, or can and should be adopted by such other agency.

"(c) Specific economic, social, or other considerations make infeasible the mitigation measures or project alternatives identified in the environmental impact report."

"the installation, operation, and maintenance by the applicant, prior to the start of any drilling, of a drainage system consisting of hydraugers . . . ; monitoring of the slide area for water table levels and landslide movement; shutting down operations if slide movement is imminent; resumption of operations only when deemed safe and permitted by the State Division of Oil and Gas and local officials; . . . establishment by the applicant, prior to the start of drilling, of a basic schedule for monitoring groundwater and landslide movement acceptable to the Departments of Building and Safety and Public Works, including areas within the landslide mass and pertinent adjoining areas; maintenance of the average (central area) groundwater levels at a depth no higher than 80 feet below surface grade, as measured in observation wells. . . ."

However, the same finding also stated that "in the event the critical groundwater levels cannot be maintained by the hydrauger drainage system, [Occidental will perform] additional technical studies to determine what additional measures could be taken to promptly correct the groundwater levels. . . ."

The trial court concluded City Council's finding that the threat to slope stability could be mitigated to an acceptable level was effectively nullified by the reference in the same finding that the proposed dewatering program might not be successful.

The trial court then considered the conditions set forth in the ordinances[16] to determine whether the purported inconsistency was resolved.

---

[16] Some of the conditions contained in the ordinances are as follows: "7a. Prior to drilling any oil wells, applicant shall design, install, maintain, and operate a monitoring system to measure ground water levels and landslide movement within the landslide mass and adjoining scarp areas northerly of the drill site located at 15147 Pacific Coast Highway. Such systems shall be subject to the approval of the Department of Building and Safety and the Bureau of Engineering prior to installation. . . . [¶] 7b. In the event that the threat of incipient landslide movement or imminent hazard involving life threat or danger to the public way occurs, as determined by appropriate city and state agencies or monitoring, applicant shall immediately cease all drilling and production activities until such conditions have been remedied and the area deemed suitable for rehabilitation by the State Division of Oil and Gas and the Departments of Building and Safety and Public Works. [¶] . . . [¶] 7e. Prior to start of any drilling, the applicant shall design, install, maintain, and operate an effective surface and subsurface drainage system within the slide mass, head scarp, and adjacent slope areas acceptable to the Departments of Building and Safety and Public Works. [¶] . . . [¶] 7g. In the event that critical groundwater levels cannot be maintained by the installed dewatering system, the appropriate agencies shall be immediately notified and all drilling and production shall cease until the water levels are corrected. Additional geological studies shall be performed by the applicant to determine what measures could be employed to lower the groundwater promptly to desired levels. The proposed corrective measures shall be submitted to the Departments of Building and Safety and Public Works for approval prior to implementing

██ While recognizing that the ordinances set forth a procedure whereby Occidental is required to satisfy various public agencies that its dewatering program successfully maintains the water level at under 80 feet below the surface grade or cease operations, the trial court concluded that if City Council intended this condition to serve as a mitigation measure, it should have been set forth in the findings themselves. We disagree.

In *City of Poway* v. *City of San Diego, supra,* 155 Cal.App.3d at page 1046, the court held that an ambiguity contained in a city council's finding regarding the requirement of improvements to mitigate certain environmental impacts could be clarified by reference to the EIR. Similarly, an apparent inconsistency in City Council's findings can be resolved by reference to contemporaneously enacted ordinances.

Like the March 1984 final supplemental EIR regarding the dewatering program for slope stabilization which recognized that complete stability cannot be assured but that the proposed system is the best method under currently known conditions, both the findings and ordinances anticipate the success of the dewatering program but recognize that, like any other scientific prediction, the program may not succeed. In the event the program does not succeed, the ordinances provide an additional safeguard by requiring the cessation of all drilling and production activities should the water level rise too high.

We conclude that the portions of the findings and ordinances dealing with slope stability, when read together, are not inconsistent.

2. Fire Protection

██ In its findings, City Council recognized that the project presents a risk of fire but concluded that this environmental risk "will be mitigated partially to a level of insignificance" by several measures including placement of a new fire station.

The draft EIR reveals that two fire stations exist in the vicinity of the proposed drill site (one is located one and three-quarters miles from the drill site and the other is located two and one-half miles from the drill site). A letter contained in the administrative record written by City's Department of Fire Battalion Chief Donald Mello indicates that while there are no current plans to construct a new fire station in the area before the year 2000, "[o]ngoing development of the overall Pacific Palisades area with commer-

---

the design plan. Corrective measures shall be required upon the onset of high groundwater levels and not delayed until creep deformation, as recommended by the consultants."

cial and residential projects, including the proposed drill sites, <u>may</u> require the additional fire facilities." (Emphasis in original.)

The trial court concluded that the matter had to be returned to City Council so it can clarify whether it intended the immediate placement of a fire station.

When the fire protection finding is considered in the context of the EIR and the administrative record, both of which were before City Council when it adopted its findings, it is clear that City Council intended that a new fire station to service the drill site be constructed if and when such placement becomes necessary. (*City of Poway* v. *City of San Diego, supra,* 155 Cal.App.3d at p. 1046.)

We therefore conclude that the trial court erred in returning the matter to City Council for clarification of the fire protection mitigation finding.

## II. The Cross-appeal

Cross-appellants contend that the drilling ordinances are inconsistent with City's general plan and that the indemnity agreement provided as a condition of the ordinances is void.

### A. Consistency With the General Plan

Cross-appellants argue that the drilling ordinances and the project they authorize are inconsistent with three elements of City's general plan (i.e., the Brentwood-Pacific Palisades District Plan, the Open Space Plan, and the Conservation Plan). Cross-appellants further assert that City Council's interpretation of City's general plan renders the plan internally inconsistent.

Before reaching these issues, we briefly discuss the Government Code's provisions regarding general plans. Government Code section 65300 requires each county and city to "adopt a comprehensive, long-term general plan for the physical development of the county or city . . . ." The general plan consists of "a statement of development policies . . . diagrams and text setting forth objectives, principles, standards, and plan proposals . . ." and includes, at a minimum, the following seven elements: land use, circulation, housing, conservation, open-space, noise, and safety. (Gov. Code, § 65302.) The general plan and each of its elements must "comprise an integrated, internally consistent and compatible statement of policies . . . ." (Gov. Code, § 65300.5.) Furthermore, zoning ordinances must be consistent with the general plan. (Gov. Code, § 65860.)

■ Judicial review of a zoning ordinance "is limited to a determination of whether the agency's action was arbitrary, capricious or entirely lacking in evidentiary support. [Citations.]" (*Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles* (1986) 177 Cal.App.3d 300, 305 [223 Cal.Rptr. 18].)

City Council specifically found that the project was consistent with City's general plan.[17] ■ This finding will be reversed only if, based on the evidence before City Council, a reasonable person could not have reached the same conclusion. (*McMillan* v. *American Gen. Fin. Corp.* (1976) 60 Cal.App.3d 175, 186 [131 Cal.Rptr. 462]; *Greenbaum* v. *City of Los Angeles, supra,* 153 Cal.App.3d 391, 407-408.)

1. The Brentwood-Pacific Palisades District Plan

■ Cross-appellants contend that the drilling ordinances are inconsistent with the Brentwood-Pacific Palisades District Plan (hereafter the District Plan) which, under the heading "Industry," states: "The Plan proposes no industrial uses within the Brentwood-Pacific Palisades District."[18]

■ Cross-appellants first argue that the so-called "plain meaning rule" (see, e.g., *Tiernan* v. *Trustees of Cal. State University & Colleges* (1982) 33 Cal.3d 211, 218-219 [188 Cal.Rptr. 115, 655 P.2d 317]), precludes this court from looking beyond the face of the district plan in order to discern the meaning of the term "industrial" since oil drilling and production is clearly industrial. We disagree.

We note that the district plan map designates the drill site area as "open space." Footnote 10 of the map provides: "Open space designations on the Plan Map conform to the definition of 'Open Space Land' set forth in Article 10.5 of the State of California Government Code and to the City's Open Space Plan."

Among the definitions of "open space land" contained in Government Code section 65560, subdivision (b), a part of article 10.5, is the following: "any parcel or area of land or water which is essentially unimproved and

---

[17]Contrary to cross-appellants' allegation, City Council's findings regarding the project's consistency with the general plan and those elements of the general plan which were contested sufficiently connected the evidence to its conclusion as required by *Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].

[18]City vigorously disputes cross-appellants' interpretation of this passage as prohibiting industrial uses as opposed to simply not contemplating such uses. For purposes of this discussion we will assume, without so holding, that the phrase "proposes no industrial uses" was intended to preclude industrial uses in the Brentwood-Pacific Palisades District.

devoted to an open-space use as defined in this section, and which is designated on a local, regional or state open-space plan as any of the following:

". . . . . . . . . . . . . . . . . . . .

"(2) Open space used for the managed production of resources, including but not limited to, forest lands, rangeland, agricultural lands and areas of economic importance for the production of food or fiber; areas required for recharge of ground water basins; bays, estuaries, marshes, rivers and streams which are important for the management of commercial fisheries; and areas containing major mineral deposits, including those in short supply." (Emphasis added.)

City's open space plan contains the following definitions: "Open space is land which is essentially free of structures and buildings and/or is natural in character and functions in one or more of the following ways: [¶] 1. Provides opportunities for recreation and education; [¶] 2. Preserves scenic, cultural or historic values; [¶] 3. Conserves or preserves natural resources or ecologically important areas; [¶] 4. Provides or preserves lands for managed production of natural resources; [¶] 5. Protects or provides for the public health and safety; [¶] 6. Enhances the economic base of the City; [¶] 7. Preserves or creates community scale and identity; and [¶] 8. Buffers or defines activity areas." (Emphasis added.)

"Open space use" is "the use of essentially unimproved land or water for (1) 'Preservation of natural resources,' (2) 'Managed production of resources,' (3) 'Outdoor recreation,' and (4) 'Public health and safety.' " (Emphasis added.)

Thus, if this court were to accept cross-appellants' contention that oil drilling and production is per se "industrial," there would exist an irreconcilable conflict between the District Plan text (which prohibits industrial uses) and the District Plan map (which permits the "managed production of [natural] resources"). ▮▮ As with the interpretation of statutes in general, portions of a general plan should be reconciled if reasonably possible. (See *Associated Homebuilders* v. *City of Livermore* (1976) 18 Cal.3d 582, 596 [135 Cal.Rptr. 41, 557 P.2d 473, 92 A.L.R.3d 1038].)

▮▮ Since the term "industrial" as used in the District Plan is not free from ambiguity, we must determine whether City Council's interpretation of the term was arbitrary, capricious or entirely lacking in evidentiary support. (*Las Virgenes Homeowners Federation, Inc.* v. *County of Los Angeles, supra,* 177 Cal.App.3d 300, 305.)

 Cross-appellants argue that oil drilling and production should be interpreted to constitute an industrial use since the zoning scheme contained in the Los Angeles Municipal Code only permits this activity, as a matter of right, in areas designated as an " 'M3' Heavy Industrial Zone." (L.A. Mun. Code, § 12.20, subd. A(18).)

While it is true that oil drilling activity cannot be conducted in an area other than one designated as "heavy industrial" without prior permission, the Los Angeles Municipal Code recognizes that the location of oil reservoirs is "difficult to anticipate." (L.A. Mun. Code, § 13.00, subd. A.) Therefore a separate and overriding scheme exists which permits oil drilling activity in any area (other than an area designated as an "Ocean-submerged Land Zone" (L.A. Mun. Code, § 12.20.1, subd. B)) even though the zoning scheme would not otherwise permit such operations. (See L.A. Mun. Code, § 13.01.)

If we were to accept cross-appellants' argument that the term "industrial" can be defined by reference to the Los Angeles Municipal Code's zoning scheme, then other uses classified therein as industrial would similarly be prohibited by the district plan. Such uses include banks (L.A. Mun. Code, § 12.17.5, subd. B(3)(b)), laundry and rug cleaning plants when conducted within a completely enclosed building (L.A. Mun. Code, § 12.17.5, subd. B(4)(1)), veterinary, dog and cat hospitals (L.A. Mun. Code, § 12.17.5, subd. (4)(o)), storage or sales of second-hand furniture and appliances (L.A. Mun. Code, § 12.19, subd. A(4)(a)(3)), riding academies or stables (L.A. Mun. Code, § 12.19, subd. A(9)), and rifle ranges (L.A. Mun. Code, § 12.19, subd. A(10)). Surely it cannot be argued that all of these uses are prohibited in the Brentwood-Pacific Palisades area.

 ██ [19.], We therefore conclude that the Los Angeles Municipal Code's zoning scheme which places oil drilling and production under the category of "heavy industrial" while at the same time permitting such activity in an otherwise nonindustrial area by way of a supplemental use district does not conclusively define oil drilling activity as industrial.[19]

Cross-appellants next argue that the district plan has been interpreted by various City officials to prohibit oil drilling and that this court should defer to the judgment of these City officials. In support of this contention, cross-appellants refer this court to a December 31, 1981, memorandum written by Senior City Planner Arch Crouch; the June 16, 1978, message by Mayor Tom Bradley vetoing a previous set of drilling ordinances; statements made

[19] We note that a classification of an activity contained in City's zoning code cannot supercede the way that same activity is classified in City's general plan. (*Neighborhood Action Group* v. *County of Calaveras* (1984) 156 Cal.App.3d 1176, 1182-1183 [203 Cal.Rptr. 401].)

by the chairman of City's planning and environment committee at a hearing conducted on May 17, 1983; and conclusions approved by the environmental quality board on July 27, 1982.

 "While the ultimate interpretation of a statute is an exercise of the judicial power [citation], when an administrative agency is charged with enforcing a particular statute, its interpretation of the statute will be accorded great respect by the courts 'and will be followed if not clearly erroneous. [Citations.]' [Citation.]" (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668-669 [150 Cal.Rptr. 250, 586 P.2d 564].)

 The Crouch memorandum, the mayor's veto message, the statements made by the chairman of City's planning and environment committee, and the legal conclusions of the environmental quality board, which merely serves in an advisory capacity (L.A. City Admin. Code, § 22.195.8), clearly do not come within the scope of the *Judson* rule since they are not interpretations of a statute by an administrative agency charged with its enforcement.

Cross-appellants claim further support for their position that oil drilling and production is necessarily industrial based on the assertions that the California Coastal Act (§ 30000 et seq.) regulates oil and gas development under the heading "industrial development" (§ 30260 et seq.); that one of the conditions imposed by the drilling ordinances is that Occidental comply with the requirements of the California Coastal Act; and that the California Coastal Commission has recently stated in one of several findings it adopted on January 15, 1987, in support of its certification of the Malibu/Santa Monica Mountains Land Use Plan,[20] that industrial uses include oil exploration and production.

Condition 20 of the drilling ordinances does indeed provide that Occidental "shall comply with the requirements of the California Coastal Act of 1976 and amendments thereto, to the satisfaction of the California Coastal Commission." However, there is a vast difference between mandating com-

---

[20] Pursuant to the various requests filed by the parties, this court has taken judicial notice of the following documents: (1) the determination of conditions and methods of operation approved by City's board of referred powers on May 6, 1986; (2) the coastal development permit approved by City's board of referred powers on July 3, 1986; (3) the West Los Angeles district plan adopted by City Council on March 21, 1974; (4) the concept of City's general plan adopted by City Council on April 3, 1974; and (5) the Malibu/Santa Monica Mountains land use plan certified by the California Coastal Commission on December 11, 1986. Since this court has taken judicial notice of the certified Malibu/Santa Monica Mountains Land Use Plan, we need not consider cross-appellants' request to judicially notice the suggested modifications to the Malibu land use plan adopted by the California Coastal Commission on November 19, 1985.

pliance with the California Coastal Act and imposing the characterizations of certain activity contained therein upon an entirely different legislative scheme (i.e., City's district plan).

Likewise, the manner in which the Coastal Commission characterizes oil exploration and production in a land use plan unrelated to the project under consideration has little bearing, if any, on the propriety of City Council's interpretation of its own land use document that it adopted 10 years earlier.

Relying on two provisions contained in the citywide plan,[21] another element of City's general plan, cross-appellants point to use of the term "extractive industries" and argue, in essence, that every activity which is extractive is necessarily industrial. We find no support for the concept that such general references mean that "extractive" and "industrial" are inexorably linked merely because they appear together in two sections of the citywide plan.[22]

As its final argument regarding this provision of the district plan, cross-appellants argue that the legislative history of the district plan demonstrates that it was intended to prohibit oil drilling and production. In support of this assertion, cross-appellants refer this court to a letter contained in the administrative record dated September 9, 1982, sent to City's planning commission from a member of the citizens advisory committee that drafted the district plan's language which "proposes no industrial uses." This letter states, in part, "[t]he Plan language quoted above was adopted to preclude oil drilling as well as all other industrial uses."

Cross-appellants also refer this court to a statement made by Councilman Marvin Braude at the July 6, 1984, City Council hearing where he stated: "Now I am unalterably opposed to this project. It's in direct conflict with the Brentwood-Pacific Palisades plan. . . . [¶] Now there is some argument about whether or not it conforms with the community plan or not. But I can tell you that was our intent. For 10 years we worked on that community plan. The people in the community worked on it. It was their intent. It

---

[21] One section of the citywide plan states: "Before being abandoned, the surface facilities of all extractive industries be removed and the premises improved to a suitable condition, taking into account adjacent land uses." Another section of the citywide plan states: "It is the City's policy that: [¶] . . . [¶] In order to minimize the adverse environmental impact of extractive industries, the City adopt standards whereby the short-term impact of such industries can be overcome and provide positive benefits to the City."

[22] Cross-appellants further argue that extractive activities are characterized in the citywide plan as industrial since the first passage quoted above is found under the heading "industry." However, the thrust of cross-appellants' argument is defeated by the fact that the second passage quoted above, which also makes a general reference to extractive activities, is listed under the heading "conservation."

was my intent. And I am sure when you talk to the people in the planning department, it was their intent that this would prohibit oil drilling in this particular coastline area. So it is not in conformance with the community plan."

██ ██ Cross-appellants' argument in this regard is not persuasive since it is well settled that, in construing legislation, a court does not consider the motives or understanding of individual legislators even when it is the person who actually drafted the legislation. (*In re Marriage of Bouguet* (1976) 16 Cal.3d 583, 589 [128 Cal.Rptr. 427, 546 P.2d 1371].)[23]

Referring to another provision of the district plan which, under the heading "Open Space and Conservation Lands," states: "Open Space Lands designated on the Plan Map are not intended to be developed for residential or other urban uses. [¶] Natural resources within the District should be conserved . . . ," cross-appellants contend that, as an urban use, oil drilling is inconsistent with the district plan.

While the district plan does not contain a section defining its terms, since this provision is contained in the section of the district plan which discusses open space lands, guidance as to its meaning can be obtained from the definitions contained in the open space plan.

The open space plan explains that the terms " '[c]onservation' or 'conserve' relate to the managed or controlled uses of open space." As noted on page 244, *ante,* the managed production of natural resources is among the definitions of "open space" and "open space use" contained in the open space plan.

Thus, as it pertains to this portion of the district plan, oil drilling is not a prohibited urban use development but rather a permitted "managed production of natural resources."

In summation, we conclude that the issue of whether the term "industrial" as used in the district plan encompasses oil drilling and production is reasonably subject to debate; that City Council's specific finding that the project is consistent with City's general plan contains an implicit finding

---

[23] In fact, the only relevant legislative history pertaining to the district plan lends support to cross-respondents' argument that the district plan's language regarding industrial uses was not intended to prohibit oil drilling and production.

A December 8, 1975, draft of the district plan by the citizens advisory committee contained the following language: "The Plan proposes no industrial uses, no hydrocarbon exploration, and no hydrocarbon production within the Brentwood-Pacific Palisades District." However, the language which referred to hydrocarbon exploration and production was specifically deleted by City's planning department staff.

that the project is not prohibited by any element of the general plan such as the district plan; and that, based on the evidence before City Council, this finding is reasonable. This court will therefore defer to City Council's interpretation of its own document. (*Greenbaum* v. *City of Los Angeles, supra,* 153 Cal.App.3d 391, 407-408.)

### 2. Consistency With the Open Space Plan

 Cross-appellants contend that the drilling ordinances are inconsistent with the open space plan. Referring to a provision in the open space plan which states that "[c]ommercial uses approved in open space areas shall be only of a convenience nature relating to various open space uses . . . ," cross-appellants argue that oil drilling is not of a "convenience nature." Cross-appellants are misconstruing this provision.

The open space plan defines "open space uses" by reference to Government Code section 65560, subdivision (b). As noted on page 246, *ante,* this section includes "the managed production of resources" among the definitions of "open space land." Thus, properly read, the open space plan's provision states that commercial uses approved in open space areas shall be only of a convenience nature relating to various open space uses, which include the managed production of resources. When read in this fashion, it is clear that the oil drilling proposed by the project is an open space use as opposed to a commercial use and therefore is not prohibited by the open space plan's provision limiting commercial uses to those of a convenience nature.

Cross-appellants next refer to the open space plan's provision that "[l]ands subject to natural or man made hazards, detrimental to life and property should be left in their natural state, where feasible, . . ." and argue that because the highway drill site "is undeniably subject to natural and manmade hazards . . . it should not be subject to resource extraction." (Emphasis omitted.) Cross-appellants' argument ignores the open space plan's definition of "natural state" which is "essentially vacant land where vegetation and life systems existing therein are native to the area."

As noted in the draft EIR's description of the highway drill site, "[t]he former paved alignment of Pacific Coast Highway covers the essentially flat site." The highway drill site is hardly in a "natural state" as that term is used in the open space plan.

Furthermore, the final supplemental EIR contains evidence that the dewatering program required by the project "will improve the stability of the

[Via de las Olas] slide mass and adjacent areas and will reduce the probability of failure."

We therefore conclude that the drilling ordinances are consistent with the open space plan.

### 3. Consistency With the Conservation Plan

 Relying on a provision in the conservation plan which states "[f]uture oil extraction activities shall be banned at surface locations on beach and offshore waters within the City's jurisdiction," cross-appellants argue that the proposed project should be prohibited. Such reliance is misplaced. As City Council specifically found, the proposed project is neither on the beach nor offshore. Therefore, there is no inconsistency between the proposed project and the conservation plan.

### 4. Internal Consistency of the General Plan

Cross-appellants allege that City Council's interpretation of the general plan rendered it internally inconsistent in violation of Government Code section 65300.5 and *Concerned Citizens of Calaveras County* v. *Board of Supervisors* (1985) 166 Cal.App.3d 90, 97 [212 Cal.Rptr. 273]. In light of our discussion of the various elements that constitute the general plan, we conclude that cross-appellants' allegation is without merit.

### B. The Indemnity Agreement

The drilling ordinances contained the following condition: "Applicant shall, prior to making application pursuant to Section 13.01H of the L.A.M.C. for determination of drill site operating conditions, sign an agreement with the City, satisfactory to the City Attorney, indemnifying the City against any liability to third parties resulting from landslide movement within the landslide mass and/or adjoining scarp areas caused in whole or in part by any improvement installed therein or thereon by the applicant or any act or omission by the applicant in connection with the subject project. In partial satisfaction of this indemnity requirement, the applicant shall name the City as an additional insured on a policy of insurance in a sum no less than $100,000,000 (One Hundred Million Dollars)."

While the final indemnity agreement was not executed until after this case was heard by the trial court, the record contains a draft indemnity

agreement[24] which provides, in pertinent part: "Occidental agrees to defend, indemnify and hold the City harmless from and against all demands, liabilities, costs (including attorneys' fees), or damages claimed by third parties against the City which were incurred by said third parties during the Term of this Agreement on account of any damage or injury to said third parties resulting from any landslide or other movement of the City Property to the extent such movement is caused by any act or omission by Occidental in the design, construction, operation or maintenance of the Drainage System. However, in the event that such landslide or other movement of the City Property would not have occurred but for an act or omission by Occidental, such movement shall be deemed to have been caused solely by the act or omission of Occidental. Furthermore, to the extent that City negligence regarding the review and/or approval of Occidental's design, construction, operation or maintenance of the Drainage System is a contributing cause of the damage, this indemnification shall apply as though the City was not negligent regarding such review and/or approval."

Cross-appellants contend that the indemnity agreement required by the ordinances is void pursuant to Civil Code sections 1668 and 2782, subdivision (b), and that permitting City to be indemnified by Occidental would defeat the policy behind the doctrine of strict liability.

1. Civil Code Section 1668

Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

In *Tunkl* v. *Regents of University of California* (1963) 60 Cal.2d 92 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693], a nonprofit, charitable hospital required as a condition of admission that all patients execute a release from liability for negligence by the hospital or its employees. The court determined that agreements between patients and hospitals affect the public interest and therefore the exculpatory provision contained in such an agreement was invalid under Civil Code section 1668. (*Id.,* at p. 94.)

Cross-appellants argue that since oil drilling meets some, if not all, of the criteria set forth in *Tunkl* to determine whether a particular activity affects the public interest (*id.,* at pp. 98-101), this court should nullify the indemni-

---

[24] At oral argument, counsel indicated that the final indemnity agreement was not materially different from the draft indemnity agreement.

ty agreement as being against public policy. Cross-appellants misconstrue the nature of the indemnity agreement required by the ordinances.

In *County of San Joaquin* v. *Stockton Swim Club* (1974) 42 Cal.App.3d 968 [117 Cal.Rptr. 300], the Stockton Swim Club, a nonprofit corporation, entered into an agreement with the Stockton Metropolitan Park and Recreation Commission, a collection of public entities jointly operating public recreational facilities. This agreement permitted the use of swimming facilities under the control of the commission by the club's members. A clause in the contract provided that the club "agreed to hold the public agencies 'free and harmless from any loss, damage, liability, cost or expense that may arise during or be caused in any way by such use or occupancy of the property.'" (*Id.,* at p. 971.)

A club member injured herself while using one of the pools under the commission's control. She brought suit against the club, the commission, and the three public entities which formed the commission. The public entities cross-complained against the club seeking indemnification for any judgment rendered against them and reimbursement for expenses incurred in defending against the plaintiff's lawsuit. The trial court rendered judgment on the cross-complaint against the club. On appeal, the club argued, inter alia, that the indemnification clause constituted an illegal contract of adhesion. In rejecting this argument, the court stated: "This is not a case where a public entity attempts to exculpate itself from its negligence toward members of the public by exacting a waiver of liability as a condition to rendering an essential public service. Rather it is an indemnity agreement by which the promisee seeks to enforce the promisor's agreement to indemnify him if and when a third party asserts a claim against the promisee. The latter is not within the class of contracts condemned by the *Tunkl* decision. [Citations.]" (*Id.,* at pp. 972-973.)

Similarly, the indemnity agreement in the case at bench does not preclude injured members of the public from holding City liable for its acts or omissions. Instead, the indemnity agreement merely provides that in such a situation, Occidental will defend, indemnify, and hold City harmless against such damages. The indemnity agreement in the case at bench "is not within the class of contracts condemned by the *Tunkl* decision. [Citations.]" (*Id.,* at p. 973.)

2. Civil Code section 2782, subdivision (b)

■ Relying on Civil Code section 2782, subdivision (b),[25] cross-appellants argue that the indemnity agreement effectively relieves City from liability for its active negligence and is therefore void. Assuming arguendo that the indemnity agreement constitutes a "construction contract" with a public agency as that term is defined by Civil Code section 2783,[26] we conclude that the indemnity agreement falls within the exception stated in Civil Code section 2782.1.[27]

Before Occidental can engage in its desired drilling activity, the threat posed by the City-owned Via de las Olas slide mass must be mitigated. If Occidental did not want to proceed with the proposed project, the drainage system would not be installed. It is clear that the drainage system is being installed in City's property by Occidental at its own expense and for its benefit.

3. Strict Liability

■ Relying on *Green* v. *General Petroleum Corp.* (1928) 205 Cal. 328, 334 [270 P. 952, 60 A.L.R. 475], cross-appellants correctly assert that City's liability in the event of an "oil well related mishap" will be determined under the doctrine of strict liability but then argue, without citation of authority, that permitting City to be indemnified by Occidental "would defeat the policy of strict liability." Regardless of the accuracy of the latter

---

[25] Civil Code section 2782, subdivision (b), provides: "Except as provided in Sections 2782.1, 2782.2, and 2782.5, provisions, clauses, covenants, or agreements contained in, collateral to, or affecting any construction contract with a public agency which purport to impose on the contractor, or relieve the public agency from, liability for the active negligence of the public agency shall be void and unenforceable."

[26] Civil Code section 2783 provides: "As used in Sections 2782 and 2782.5, 'construction contract' is defined as any agreement or understanding, written or oral, respecting the construction, surveying, design, specifications, alteration, repair, improvement, maintenance, removal of or demolition of any building, highway, road, parking facility, bridge, railroad, airport, pier or dock, excavation or other structure, development or other improvement to real or personal property, or an agreement to perform any portion thereof or any act collateral thereto, or to perform any service reasonably related thereto, including, but not limited to, the erection of all structures or performance of work in connection therewith, the rental of all equipment, all incidental transportation, crane and rigging service and other goods and services furnished in connection therewith."

[27] Civil Code section 2782.1 provides: "Nothing contained in Section 2782 shall prevent a contractor responsible for the performance of a construction contract, as defined in Section 2783, from indemnifying fully a person, firm, corporation, state or other agency for whose account the construction contract is not being performed but who, as an accommodation, enters into an agreement with the contractor permitting such contractor to enter upon or adjacent to its property for the purpose of performing such construction contract for others."

part of cross-appellants' argument, reliance on *Green* is misplaced since the indemnity agreement deals with injuries resulting from "the design, construction, operation or maintenance of the Drainage System" and not injuries resulting from Occidental's oil drilling activities. We therefore conclude that the indemnity agreement is proper.

### DISPOSITION

The judgment is reversed. The parties to bear their own costs.

Spencer, P. J., and Hanson (Thaxton), J., concurred.

A petition for a rehearing was denied December 7, 1987, and the petitions of plaintiffs and appellants and plaintiffs and respondents for review by the Supreme Court was denied February 25, 1988. Mosk, J., did not participate therein.