[Civ. No. 49747. Second Dist., Div. Four. Sept. 12, 1977.]

BIG ROCK MESAS PROPERTY OWNERS ASSOCIATION et al.,
Plaintiff and Appellants, v.
BOARD OF SUPERVISORS OF THE COUNTY OF LOS ANGELES
et al., Defendants and Respondents;
WAHLQUIST ENTERPRISES, Real Party in Interest
and Respondent.

**COUNSEL**

Peter I. Ostroff and Kenneth R. Chiate for Plaintiffs and Appellants.

John H. Larson, County Counsel, and David H. Breier, Deputy County Counsel, for Defendants and Respondents.

Oliver, Stoever & Laskin, Norman G. Oliver, Thomas W. Stoever and Ronald J. Einboden for Real Party in Interest and Respondent.

## Opinion

DUNN, J.—Big Rock Mesas Property Owners Association and others[1] filed, in superior court, a petition for a writ of mandate (Code Civ. Proc., § 1094.5) and application for an injunction which would have commanded defendants Board of Supervisors of the County of Los Angeles and the Regional Planning Commission of the County of Los Angeles to set aside their approval of tentative tract map No. 30835 for a proposed residential subdivision known as "Bel Mar Estates" consisting of approximately 1,417 acres of unimproved land in the Santa Monica Mountains. Petitioners are homeowners, taxpayers and residents of an unincorporated area of Los Angeles County known as the Big Rock area of Malibu whose interests allegedly would be adversely affected by the proposed development. Defendant board of supervisors is the governing body responsible for approving tentative tract maps for subdivisions in unincorporated portions of the county. Defendant regional planning commission is an advisory agency to which the board of supervisors has delegated the initial responsibility for approving or disapproving proposed subdivisions subject to an appeal, by any interested person, to the board of supervisors. The petition named as real party in interest Wahlquist Enterprises, the developer of Bel Mar Estates and the applicant for approval of the tentative tract map for such project.

The first amended and supplemental petition alleged: the proposed development consists of two stages—phase I, involving 174 improved residential lots on 531 acres, and phase II, involving 168 improved residential lots on 886 acres; "the actions challenged by this Petition primarily relate to an approval of a tentative subdivision tract map for a long, steep access route from Pacific Coast Highway into the development and the 174 'improved residential lots' included in Phase I"; the regional planning commission approved tentative tract map No. 30835 for the subdivision, and filed a notice of determination with the county clerk; the decision of the commission approving the tentative tract map was appealed by petitioners to the board of supervisors; the board affirmed the commission's approval of the map; such approvals by defendants violate the California Environmental Quality Act of 1970 (Pub. Resources Code, § 21000 et seq.), the Subdivision Map Act (Gov.

---

[1]The other petitioners are: Malibu-Big Rock Association; Topanga Association For A Scenic Community; Nina Graham; and Duane Storhaug.

Code, § 66410 et seq.) and the Los Angeles County subdivision ordinance.

The defendants and the real party in interest filed answers to the first amended and supplemental petition. A hearing was had at which the administrative record of the proceedings of defendants was received in evidence. Findings of fact and conclusions of law were signed and filed. The facts found by the trial court included the following: the project in this case is the approval of a subdivision which divides 531 acres of land into 177 lots (174 lots to be sites for 174 detached single-family residences, 2 lots to remain as permanent open space, and 1 lot to be used as an equestrian center); the size of the average residential lot is in excess of 2.3 acres, and the density of the total project is less than 1 unit per 3 acres; 75-80 percent of the site will remain in its natural state; the subdivision is rural in character; the original tentative tract map was filed with the county clerk in July 1972; it was amended in October 1974 and in February 1975; prior to April 16, 1975, Bel Mar Estates submitted to the planning department a document entitled "Draft Environmental Impact Report" (hereinafter Preliminary EIR); shortly thereafter the planning department requested additional data and was supplied with a document entitled "Amendment to Draft Environmental Impact Report"; subsequently, the planning department undertook its own independent review of the environmental effects of the proposed subdivision by obtaining comments regarding the Preliminary EIR from all relevant state and local agencies and departments; based upon this review, the planning department prepared a document entitled "Draft Environmental Impact Report, Tentative Tract No. 30835, Malibu Area" (hereinafter Draft EIR); the planning commission conducted two public hearings on the Draft EIR; due notice of the hearings was given as required by law; petitioners were represented at each hearing and gave testimony; on April 25, 1975, the planning department prepared a document entitled "Final Environmental Impact Report, Tentative Tract No. 30835, Malibu Area" (hereinafter Final EIR); the Final EIR (including the Draft EIR, the Preliminary EIR and amendment to Preliminary EIR) was submitted to the planning commission; on September 24, 1975, after reviewing the Final EIR, the planning commission made its findings of fact, certified the Final EIR as having been completed in compliance with all laws, and approved tentative tract map No. 30835; on December 8, 1975, the planning commission filed its notice of determination with the county clerk; petitioners appealed the

decision of the planning commission to the board of supervisors and the board conducted a public hearing on the appeal; due notice of the hearing was given as required by law; petitioners were represented at the hearing and gave testimony; on February 17, 1976, after reviewing the Final EIR and all records of the planning commission, the board of supervisors adopted the commission's findings, certified the Final EIR as having been completed in compliance with all laws, and approved tentative tract map No. 30835; on February 20, 1976, the board of supervisors filed its notice of determination with the county clerk; the findings adopted by the planning commission and the board of supervisors were supported by substantial evidence; the county and each of its agencies, boards and departments have complied fully with all requirements of the California Environmental Quality Act, the Subdivision Map Act, and the county's subdivision ordinance.

Judgment was entered denying the petition for writ of mandate and the application for an injunction. Petitioners appeal from the judgment.

I

The tentative tract map indicates that the primary access route to the proposed development is proposed "A" Street, through Piedra Gorda Canyon, terminating at Pacific Coast Highway on the south and Tuna Canyon Road on the north. The Final EIR states that a portion of proposed "A" Street (about one mile) will be constructed at a grade of 15 percent, and that the county road department has conditioned approval of such construction by requiring the installation of two vehicle escape ramps along the road for emergency safety stops.

Government Code section 66473 provides in pertinent part: "A local agency shall disapprove a map for failure to meet or perform any of the requirements or conditions imposed by this division [the Subdivision Map Act] or local ordinance enacted pursuant thereto . . . ."

Los Angeles County ordinance No. 4478, section 55, provides: "No highway or street shall have a grade of more than six (6) percent, except for short stretches where the topography makes it impracticable to keep within such grade, and in no event shall the grade exceed ten (10) percent, except where evidence, which is satisfactory to the Regional Planning Commission, is given that a lower grade is not possible."

Petitioners contend that defendants' approval of the tentative tract map violated the above provisions because: (1) the map shows that a grade of 15 percent on proposed "A" Street will be maintained without interruption for approximately 1.6 miles, and such a distance cannot reasonably be classified as a "short stretch"; (2) there was no evidence that a lower grade was not possible. Under the ordinance, a street grade exceeding 10 percent is permitted where there is evidence satisfactory to the regional planning commission that a lower grade is not possible. This exception is not limited by the "short stretch" provision, which is applicable only where the commission finds that a grade lower than 10 percent is possible. ▮▮ Accordingly, the sole question is whether evidence was presented to the commission which showed, to its satisfaction, that a grade of less than 15 percent on "A" Street was not possible.

The trial court found, as a fact: "The [Subdivision] Committee, being responsible to review all tract maps and to make recommendations to the Planning Commission and the Board of Supervisors, recommended to such bodies the approval of road grades in excess of 10 percent, but not exceeding 15 percent, and such recommendations, together with other testimony from members of the Committee, constitutes evidence satisfactory to Respondents, and each of them, that a lower grade was not possible as to such road grades." ▮▮ In a proceeding to review the decision of a local administrative body, a court is confined to determining whether there was substantial evidence before the body to support its decision. (*Rapp* v. *Napa County Planning Com.* (1962) 204 Cal.App.2d 695, 697-698 [22 Cal.Rptr. 643]; *Eashman* v. *City & County of S. F.* (1960) 179 Cal.App.2d 782, 785 [4 Cal.Rptr. 264].) On appeal from the judgment in such a proceeding, an appellate court is limited to determining whether there is substantial evidence, contradicted or uncontradicted, to support the determination of the trial court. (*San Diego Gas & Elec. Co.* v. *Sinclair* (1963) 214 Cal.App.2d 778, 781-782 [29 Cal.Rptr. 769]; *Riggins* v. *Board of Education* (1956) 144 Cal.App.2d 232, 236-237 [300 P.2d 848]; *Corcoran* v. *S. F. etc. Retirement System* (1952) 114 Cal.App.2d 738, 740-741 [251 P.2d 59].)

The administrative record herein shows: At one of the hearings before the regional planning commission regarding tract No. 30835, the chairman of the county's subdivision committee stated: "And other impacts on transportation would be the fifteen percent grade approxi-

mately one mile from the entry of the Pacific Coast Highway which stems up to the traffic. This is along the area that the property touches the Pacific Coast Highway. *To develop the minimum grading possible* with the terrain because of the extended fifteen percent grade, the Road Department suggests that we make the requirement of the emergency branch, constructed along the entrance street—A Street." (Italics added.) On petitioners' appeal from the planning commission's approval of the tentative tract map, the board of supervisors considered a report from the county road commissioner which stated: "A requirement of flatter grades would, in this proposed development, require the moving of a very substantially greater quantity of material. Based upon our past experience, I believe *we have reached the best available solution to provide access to this development. . . .* Steep grades do require more attention and concentration on the part of the driver. However, in hilly terrain such as the Big Rock area, *there is no practical way to achieve grades and alignments that can be provided in other areas with more favorable terrain.* Recognizing the possibility of runaway vehicles, the County has required that the developer provide two escape ramps or arrester beds on Big Rock slide." (Italics added.)

Petitioners point out that neither the planning commission nor the board of supervisors made a specific finding that a grade of less than 15 percent was not possible. On this basis, petitioners argue that the decisions approving the tentative tract map cannot stand because "implicit in section 1094.5 [Code Civ. Proc.] is a requirement that the agency which renders the challenged decision must set forth findings to bridge the analytic gap between the raw evidence and ultimate decision or order." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12].) ▮ However, county ordinance No. 4478, section 55, does not expressly require that, as a condition precedent to valid approval of a grade steeper than 10 percent, the planning commission make a specific finding that a lower grade is not possible. Under the ordinance, approval is proper if evidence is presented to the commission which shows, to its satisfaction, that a lower grade is not possible. The trial court found, as a fact, that such evidence was presented to the commission. Indulging, as we must, all reasonable and legitimate inferences to uphold that finding (*Lacy* v. *California Unemployment Ins. Appeals Bd.* (1971) 17 Cal.App.3d 1128, 1134 [95 Cal.Rptr. 566]), we cannot say that the finding is unsupported by the administrative record.

## II

The trial court's findings of fact included the following:

"The County and each of its agencies, boards and departments have complied fully with all requirements of the California Environmental Quality Act and any and all guidelines promulgated thereunder.

"The Environmental Impact Report consisted of the Preliminary EIR, Amendment to Preliminary EIR, Draft EIR, and Final EIR; is not superficial in any material respects; satisfies in all respects the requirements of all state and local laws and regulations, guidelines and rules promulgated thereunder; and provided adequate environmental information to allow Respondents, and each of them, to take full account of the environmental consequences of their approval of Tract No. 30835."

Petitioners challenge these findings on the following grounds: (1) the EIR fails to present, analyze or examine alternative means of implementing the proposed project; (2) it does not examine and evaluate the impact of the second phase of the proposed two-phase development; and (3) it is not the "detailed statement" required by statute, but is superficial throughout.

1. Petitioners contend the EIR does not meet the requirements of California law[2] in that it fails to discuss "alternatives to the enormous

---

[2]Public Resources Code section 21100 requires that an EIR include a "detailed statement" setting forth: "(a) The significant environmental effects of the proposed project. [¶] (b) Any significant environmental effects which cannot be avoided if the project is implemented. [¶] (c) Mitigation measures proposed to minimize the significant environmental effects . . . . [¶] (d) Alternatives to the proposed project. . . ."

Section 15143 of the State EIR Guidelines (Cal. Admin. Code, tit. 14, § 15000 et seq.) requires that an EIR discuss the following subjects, among others: "(a) Describe the direct and indirect significant effects of the project on the environment, giving due consideration to both the short-term and long-term effects. . . . [¶] (b) Describe any significant impacts, including those which can be reduced to an insignificant level but not eliminated. Where there are impacts that cannot be alleviated without imposing an alternative design, their implications and the reasons why the project is being proposed, notwithstanding their effect, should be described. . . . [¶] (c) Describe significant, avoidable, adverse impacts . . . and measures to minimize these impacts. . . . Where several measures are available to mitigate an impact, each should be discussed and the basis for selecting a particular measure should be identified. . . . [¶] (d) Describe all reasonable alternatives to the project, or to the location of the project, which could feasibly attain the basic objectives of the project, and why they were rejected in favor of the ultimate choice. The specific alternative of 'no project' must also always be

amount of grading and the filling and construction of an unlawfully steep access road in a natural canyon." The pertinent statute and EIR guidelines require that an EIR describe alternatives to the proposed *project.* (See fn. 2.) We interpret such requirement as applicable only to the project as a whole, not to the various facets thereof, such as grading and access roads.[3] Thus, contrary to petitioners' contention, the EIR herein is not deficient for its failure specifically to describe alternatives to the amount of grading proposed for the project, and alternatives to the location and character of the proposed access road ("A" Street). The EIR discusses in detail the mitigating measures to be taken in minimizing the impact of the grading and the access road.[4] It also discusses alternatives to the project in its entirety. The law requires no more.

---

evaluated, along with the impact. The discussion of alternatives shall include alternatives capable of substantially reducing or eliminating any significant environmental effects, even if these alternatives substantially impede the attainment of the project objectives, and are more costly."

[3]Section 15037, state EIR guidelines, reads in part: "(a) Project means the *whole of an action,* which has a potential for resulting in a physical change in the environment, directly or ultimately . . . . (c) The term 'project' refers to the activity which is being approved . . . ." (Italics added.)

[4]Regarding grading, the EIR states: "*Mitigating Measures:* [¶] The amount of grading to be performed (about 7.4 million cubic yards) is considered substantial and there are no apparent measures which can eliminate this impact, except for a different design concept. However, the areas anticipated to be graded will be limited to about 20-25 percent of the entire acreage. Some of the area along ridges has been previously rough graded for brush fire control, access roads, and small building pads. Even with grading on 1/5 of the total ownership, approximately 268 acres will be directly impacted. The developer has indicated other more feasible development of land, such as cluster housing, to reduce earthmoving. The developer also intends to restudy the earthwork scheme in order to achieve a more balanced cut and fill project to deal with the anticipated excess 2.9 million cubic yards which would otherwise require exportation or some alternate means of disposal. . . ."

Regarding transportation (including access), the EIR states: "*Mitigating Measures:* [¶] The traffic report . . . states that due to the very low residential density proposed, traffic generated by the development will have a minimal impact on the operation of the road system in the area. It is suggested that mitigation measures to meet peak recreational demand should be met on a regional basis . . . . [¶] Proposed "A" Street will not exceed a 15 percent grade and two ramps will be located along the road to provide emergency stops for vehicles, conforming to requirements of the County Road Department. [¶] A school bus turnaround for the proposed development and Big Rock Mesas residents will be provided in the final plans to be located near the front gates of the proposed development . . . ." [¶] Emergency exiting from the project site will be through "A" Street at PCH [Pacific Coast Highway] and Tuna Canyon Road. A break-way fence on McAnany Way is perceived by the developer to create a faster, safer exit for upper Big Rock Mesas residents, and provide two possible means for exit to the southeast for residents of the subject property. This emergency exit is necessary for public safety and its use limited, thus it should not cause disruption."

2. Petitioners attack the EIR on the further ground it fails adequately to discuss Phase II of the proposed project.

Section 15069 of the State EIR Guidelines provides: "Where individual projects are, or a phased project is, to be undertaken and where the total undertaking comprises a project with significant environmental effect, the Lead Agency must prepare a single EIR for the ultimate project. Where an individual project is a necessary precedent for action on a larger project, or commits the Lead Agency to a larger project, with significant environmental effect, an EIR must address itself to the scope of the larger project. . . ."

The EIR states: ". . . Phase II is discussed only as a probability and the discussion of phasing impact is treated as a hypothetical environmental effect; where possible specific data has [sic] been provided. Phase II development is considered hypothetical since a formal development request has not been received and there is no firm commitment to develop this area. This EIR addresses the total project area of 1,417 acres which includes both Phases I and II. This is in accordance with Section 15069 of the State EIR Guidelines regarding multiple and phased projects. Some of the impacts are common to the entire acreage; however, some impacts will vary between phases . . . . Prior to development of Phase II, additional approvals and more detailed environmental documentation would be required." In subsequent portions of the EIR, the potential impact of phase II is discussed. It is apparent that, at the time the EIR was prepared, there was a firm commitment to develop only phase I of the proposed project. Insofar as development of the entire project (phases I and II) is contingent on the prior completion of phase I, the EIR adequately addresses itself to the scope of the entire project, as required by section 15069.

3. Petitioners' final objection to the EIR is that it does not discuss in sufficient detail the environmental consequences of the proposed project. In support of this contention petitioners cite, out of context, 13 statements from the EIR and add to each their comment intended to show its inadequacy. Such comments are not substantiated by any reference to the evidence adduced at the administrative proceedings. (4) An EIR "should provide decisionmakers with information which enables them to make a decision which intelligently takes account of the environmental consequences [citations]. However, an evaluation

of the environmental effects of a proposed project need not be exhaustive [citation]. The sufficiency of an EIR is to be reviewed in the light of what is reasonably feasible [citations]. Preparation of an EIR need not be interminably delayed 'to include all potential comments or results of works in progress which might shed some additional light on the subject of the impact statement. . . . The courts should look for adequacy and completeness in an impact statement, not perfection.' " (*San Francisco Ecology Center* v. *City and County of San Francisco* (1975) 48 Cal.App.3d 584, 594 [122 Cal.Rptr. 100].) In light of these standards, we cannot say, as a matter of law, that the EIR's discussion of environmental consequences of the proposed project was inadequate.

The judgment is affirmed.

Kingsley, Acting P. J., and Jefferson (Bernard), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied November 25, 1977. Bird, C. J., was of the opinion that the petition should be granted.