[No. B063820. Second Dist., Div. Three. Sept. 1, 1993.]

AL LARSON BOAT SHOP, INC., et al., Plaintiffs and Appellants, v. BOARD OF HARBOR COMMISSIONERS OF THE CITY OF LONG BEACH et al., Defendants and Appellants.

**COUNSEL**

Fadem & Douglas and Andrew H. Kopkin for Plaintiffs and Appellants.

John R. Calhoun, City Attorney, Einar C. Petersen and Richard L. Landes, Deputy City Attorneys, Sullivan, Workman & Dee and Henry K. Workman for Defendants and Appellants.

## OPINION

FARRELL, J.*—Defendants and appellants Board of Harbor Commissioners of the City of Long Beach and the City of Long Beach, a municipal corporation (jointly referred to as the Board), appeal from a judgment of the trial court ordering that a writ of mandate issue commanding the Board, due to noncompliance with the California Environmental Quality Act (CEQA), to: (1) vacate its certification of the final program environmental impact report (FEIR) for an amendment (PMP 90) to the port master plan; (2) vacate its adoption of PMP 90; and (3) suspend activity considered in PMP 90, with the exception of one project, that could result in any environmental change until there is compliance with CEQA. The Board also appeals from the award of attorney fees and costs pursuant to Code of Civil Procedure section 1021.5 in the amount of $306,454.66.

Plaintiffs and appellants Al Larson Boat Shop, Inc., L.G. Everist, Inc., Mitsubishi Cement Corporation, Inc., World Oil Company, Inc. and Warland Investments, Inc. (hereinafter collectively referred to the Larson Parties) appeal from the court's partial disallowance of the Larson Parties' claim for $559,479.86 in attorney fees and costs.

We conclude that the FEIR in question complied with the requirements of CEQA and therefore reverse the judgment and direct the trial court to enter judgment for the Board.

### FACTUAL AND PROCEDURAL BACKGROUND

The Port of Long Beach (Port) consists of both water and land use areas covering 7,608 acres which are surrounded by a heavily urbanized city. It is governed by the Board, which is a department of the city.

Following the adoption of the California Coastal Act of 1976 (Pub. Resources Code, § 30000 et seq.) the Port prepared and adopted a port master plan (PMP) which was certified by the California Coastal Commission on October 17, 1978, and which has been revised from time to time thereafter.

PMP 90 is a five-year plan constituting a further amendment to the PMP. After circulating a notice of preparation of an FEIR regarding PMP 90, and conducting hearings, the Board certified the FEIR for PMP 90 and adopted

---

*Judge of the Los Angeles Superior Court sitting under assignment by the Chairperson of the Judicial Council.

PMP 90 as an amendment to the PMP on May 14, 1990. PMP 90 and the related FEIR describe six anticipated port projects: (1) Berths 95-97 Marine Terminal Development, (2) North Harbor acquisition and development, (3) West 7th Street Terminal expansion, (4) North American Materials Marine Terminal, (5) Pier J Southeast Basin, and (6) master road and railway transportation improvements.

Separate project-specific environmental impact reports (EIR's) were concurrently developed and approved by the Board for two of the six projects: Berths 95-97 Marine Terminal Development (approved June 1990) and the West 7th Street Terminal expansion (approved May 21, 1990).

The "Larson Parties" are owners of private business property on the 7th Street Peninsula in the Port who would be adversely affected by the West 7th Street Terminal expansion project.

*The Instant Action*

On June 18, 1990, the Larson Parties filed a petition for writ of mandate challenging the certification of the FEIR and the adoption of PMP 90 by the Board on May 14, 1990, claiming that the FEIR violated the requirements of CEQA.

The trial[1] took place over the course of 11 hearing dates, from May 22 to August 23, 1991. The court and the parties identified 16 issues to be determined at trial. The court found for the Board on 14 of the issues. The court found against the Board on two issues: (1) the inadequacy of the policy and program alternatives; and, (2) the cumulative impacts sections of the FEIR.

The court filed its statement of decision on September 27, 1991 and filed its judgment on October 28, 1991, deferring the determination of attorney fees for a later hearing. At the request of the Board, the judgment exempted one of the six projects considered in PMP 90, the Berths 95-97 Marine Terminal Project, from the writ. On November 26, 1991, the court issued its statement of decision on attorney fees. On December 18, 1991, the court filed its order granting attorney fees pursuant to Code of Civil Procedure section 1021.5 and costs to the Larson Parties against the Board in the amount of $306,454.66.

---

[1]The Larson Parties' case was consolidated for the purpose of trial with a similar case brought by Powerine Oil Company (Powerine). The court found that Powerine failed to exhaust its administrative remedies and was not properly before the court. Powerine did not appeal from the judgment.

The Board filed a timely notice of appeal on December 20, 1991 from the adverse rulings in the judgment and from the award of attorney fees and costs. On December 27, 1991, the Larson Parties filed a timely cross-appeal on the inadequacy of the attorney fee award.

## CONTENTIONS

The Board contends that the court judged the FEIR by a strict standard that is appropriate for a specific project EIR but not for a program EIR. It also contends that the award of attorney fees under Code of Civil Procedure section 1021.5 was not authorized because there was no evidence that the necessity and financial burden of the litigation was not commensurate with the personal stake of the Larson Parties in the litigation as required under *Beach Colony II* v. *California Coastal Com.* (1985) 166 Cal.App.3d 106 [212 Cal.Rptr. 485].

The Larson Parties contend that the FEIR does not comply with CEQA in its consideration of alternatives and cumulative impacts, principally by deferring analysis to future project EIR's. They also contend that the court abused its discretion in disallowing $253,025.20 in claimed fees.

## DISCUSSION

### 1. Standard of Appellate Review

The standard of review of whether an agency has complied with CEQA requirements governing consideration of alternatives and mitigation measures in adopting an EIR is determined by Public Resources Code section 21168.5. (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 392 [253 Cal.Rptr. 426, 764 P.2d 278].) The inquiry "shall extend only to whether there was a prejudicial abuse of discretion" by the public agency. "Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence." (Pub. Resources Code, § 21168.5.)

The "standard of review" under Public Resources Code section 21168.5 "does not permit the reviewing court to make its own factual findings." (*Burbank-Glendale-Pasadena Airport Authority* v. *Hensler* (1991) 233 Cal.App.3d 577, 590 [284 Cal.Rptr. 498].) Thus, the task on appeal is the same as that of the trial court: that is, to review the agency's actions to determine whether the agency complied with procedures required by law. (*A Local & Regional Monitor* v. *City of Los Angeles* (1993) 12 Cal.App.4th

1773, 1793 [16 Cal.Rptr.2d 358]; *Save Our Residential Environment* v. *City of West Hollywood* (1992) 9 Cal.App.4th 1745, 1751 [12 Cal.Rptr.2d 308].)

### 2. *CEQA and Environmental Impact Reports*

The Supreme Court has stated that the "foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' [Citation.]" (*Laurel Heights, supra,* 47 Cal.3d at p. 390.) With narrow exceptions, CEQA requires an EIR whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. (*Ibid.*) "Project" is defined to include amendments to a local general plan or elements thereof. (Cal. Code Regs., tit. 14, §§ 15000 et seq. (hereinafter Guidelines), 15168.)[2]

The code defines an EIR as "an informational document" whose purpose "is to provide public agencies and the public in general with detailed information about the effect which a proposed project is likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project." (Pub. Resources Code, § 21061.) The EIR has been described as the " 'heart of CEQA' " which protects not only the environment but also informed self-government. (*Citizens of Goleta Valley, supra,* 52 Cal.3d at p. 564.)

The "core of an EIR" is the mitigation and alternatives section. (52 Cal.3d at p. 564.) The Legislature has declared the policy of the state that public agencies "should not approve projects as proposed if there are feasible alternatives or feasible mitigation measures available which would substantially lessen the significant environmental effects of such projects[.]" (Pub. Resources Code, § 21002.) The Supreme Court has stated that the consideration of alternatives must be judged against a rule of reason to ensure that all reasonable alternatives to proposed projects are thoroughly assessed by responsible officials. (*Citizens of Goleta Valley, supra,* 52 Cal.3d at p. 564.)

In general ". . . the EIR must contain facts and analysis, not just the agency's bare conclusions or opinions." (*Concerned Citizens of Costa Mesa,*

---

[2]Courts are required to "afford great weight" to the Guidelines "except when a provision is clearly unauthorized or erroneous under CEQA." (*Citizens of Goleta Valley* v. *Board of Supervisors* (1990) 52 Cal.3d 553, 564, fn. 3 [276 Cal.Rptr. 410, 801 P.2d 1161].)

*Inc.* v. *32nd Dist. Agricultural Assn.* (1986) 42 Cal.3d 929, 935 [231 Cal.Rptr. 748, 727 P.2d 1029]; *Citizens of Goleta Valley, supra,* 52 Cal.3d at p. 568.) The EIR must effectively disclose to the public the "analytic route the . . . agency traveled from evidence to action." (*Topanga Assn. for a Scenic Community* v. *County of Los Angeles* (1974) 11 Cal.3d 506, 515 [113 Cal.Rptr. 836, 522 P.2d 12]; *Citizens of Goleta Valley, supra,* 52 Cal.3d at p. 568.)

■ A reviewing court does not pass upon the correctness of the EIR's environmental conclusions, but only upon its sufficiency as an informative document. (*Laurel Heights, supra,* 47 Cal.3d at p. 392.) Courts do not "substitute our judgment for that of the people and their local representatives. We can and must, however, scrupulously enforce all legislatively mandated CEQA requirements." (*Citizens of Goleta Valley, supra,* 52 Cal.3d at p. 564.) ■ "Under CEQA, an EIR is presumed adequate (Pub. Resources Code, § 21167.3), and the plaintiff in a CEQA action has the burden of proving otherwise." (*State of California* v. *Superior Court* (1990) 222 Cal.App.3d 1416, 1419 [272 Cal.Rptr. 472].)

### 3. *Tiering and Program EIR's*

The "project" on which an EIR must be prepared "encompasses a wide spectrum, ranging from the adoption of a general plan, which is by its nature tentative and subject to change, to activities with a more immediate impact, such as the issuance of a conditional use permit for a site-specific development proposal." (*Sierra Club* v. *County of Sonoma* (1992) 6 Cal.App.4th 1307, 1315 [8 Cal.Rptr.2d 473].)[3]

The Code directs that ". . . environmental impact reports shall be tiered whenever feasible[.]" (Pub. Resources Code, § 21093, subd. (b).) Tiering means "the coverage of general matters and environmental effects in an environmental impact report prepared for a policy, plan, program or ordinance followed by narrower or site-specific environmental impact reports . . . ." (Pub. Resources Code, § 21068.5; Guidelines, § 15385.)

One form of a tiered EIR is the program EIR, which is provided for in the Guidelines, but not the code. A program EIR "may be prepared on a series of actions that can be characterized as one large project and are related either: (1) Geographically, (2) As logical parts in the chain of contemplated actions, (3) In connection with issuance of . . . plans . . . to govern the conduct of

---

[3]Like many of the cases relied on herein, this opinion was published subsequent to the trial court's decision in this matter.

a continuing program, or (4) As individual activities carried out under the same authorizing . . . authority and having generally similar environmental effects which can be mitigated in similar ways." (Guidelines, § 15168, subd. (a).)

With this as a preface, we give specific consideration to the two issues which are the subject of this appeal: (1) the consideration of alternatives and (2) the consideration of cumulative impacts.

### 4. The Consideration of Alternatives

The consideration of alternatives is presented in four pages of the FEIR and covers five alternatives: (1) no project, (2) accelerate the 2020 plan (a long-range development plan), (3) emphasize recreational and commercial development, (4) develop only primary Port facilities, and (5) specialize in certain cargo types.

### a. Program EIR or Tiered EIR

There is some confusion over the labelling of the FEIR. The FEIR called itself a "Final Program Environmental Impact Report." A program EIR as provided for in the Guidelines is an *optional* procedure to review in one document a "series of actions that can be characterized as one large project[.]" (Guidelines, § 15168, subd. (a).)

However, the amendment of a local general plan is defined as a "project." (Guidelines, § 15378, subd. (a)(1).) An EIR is *required* for any local agency project which may have a significant effect on the environment. (Pub. Resources Code, § 21151.)

The FEIR in question properly should be considered a "tiered" EIR rather than a program EIR. The code itself provides for tiering and requires the procedure "whenever feasible." (Pub. Resources Code, §§ 21093, 21068.5.) The Guidelines provide that " 'Tiering' refers to the coverage of general matters in broader EIRs (such as on general plans . . .) with subsequent narrower EIRs or ultimately site-specific EIRs . . . . Tiering is appropriate when the sequence of EIRs is: (a) From a general plan, policy, or program EIR to a . . . site-specific EIR." (Guidelines, § 15385.)

All EIR's must cover the same general content. (Guidelines, §§ 15120-15132.) █ The level of specificity of an EIR is determined by the

nature of the project and the "rule of reason" (*Laurel Heights, supra,* 47 Cal.3d at p. 407), rather than any semantic label[4] accorded to the EIR.

### b. *Defining the Project*

The "project" as defined in PMP 90 "is a five-year plan" which essentially consists of updating the PMP, and defining a short-term (five-year) goal of the Port to meet increased demand for handling commercial cargo through the use of six "anticipated" projects, which include three minor landfills. The alternatives the Port considered were alternatives to this overall five-year plan.

■ PMP 90 did not change the master plan land use designations or zoning for the six "anticipated" projects. Consideration of the landfills was a "primary purpose" of PMP 90 so that Coastal Commission certification pursuant to the California Coastal Act (Pub. Resources Code, § 30715) could be obtained. This submission to the Coastal Commission for certification did not constitute a project subject to CEQA.[5]

■ The Board contends that the FEIR was not intended to be a material step in officially selecting the final site of any of the "anticipated" projects. The locations of the "anticipated" projects were provided so that the five-year plan could be discussed in a reasonably detailed manner. In this view, PMP 90 merely indicated the *preferred* locations for the six "anticipated projects."

Indeed, in PMP 90 and the FEIR the Board committed itself to "conduct individual environmental assessments in accordance with CEQA on a project-by-project basis for each of the indicated projects." The FEIR states: "the PMP Update and [the FEIR] describe anticipated projects for informational purposes—approval of the PMP and [the FEIR] will not constitute approval of anticipated projects." The FEIR and PMP 90 both indicate that their intent is to address under CEQA only alternatives to the five-year plan project as a whole and cumulative impacts of the project as a whole.

A review of the two project EIR's that were approved within days after the FEIR show that each considered alternatives to the specific projects,

---

[4]See Guidelines, section 15160.

[5]"CEQA does not apply to activities and approvals pursuant to the California Coastal Act (commencing with Section 30000 of the Public Resources Code)" by a "local government . . . for the preparation and adoption of a local coastal program . . . ." (Guidelines, § 15265, subd. (a)(1); see also, Pub. Resources Code, § 21080.9; Remy et al., Guide to the Cal. Environmental Quality Act (7th ed. 1993) ch. 4, p. 57.)

including alternative locations, without claiming any weight for any supposed "planning" of locations by PMP 90. In an analogous case, the court held that an EIR was not required to be prepared when a school district located a "preferred" site for a school. Instead, consideration of alternative locations could be deferred to the time of the project EIR. (*Stand Tall on Principles* v. *Shasta Union High Sch. Dist.* (1991) 235 Cal.App.3d 772 [1 Cal.Rptr. 2d 107].) The court reasoned that "the Board's resolutions regarding the site selection do not constitute an 'approval' under CEQA because they do not commit the District to a *definite course* of action since they are expressly made contingent on CEQA compliance." (*Id.* at p. 781.)

We conclude that the "project" in this case was the five-year plan of the Board to increase Port cargo handling capacity in the short-term through the means of the six "anticipated" projects, rather than the "approval" of any of the "anticipated" projects or their locations.

c. *Alternative Sites for the Six "Anticipated Projects"*

Within the context of the FEIR and PMP 90, it is clear that there was no "approval"[6] of specific sites for the six "anticipated" projects and that locations were discussed for the purposes of giving a reasonably detailed consideration to the overall five-year plan, and with respect to the landfills, to define them for Coastal Commission review.

 Without question, alternatives to each of the six "anticipated" projects had to be considered at some point.[7] The real issue is when. The "determination of the earliest feasible time to [prepare an EIR] is to be made initially by the agency itself, which decision must be respected in the absence of manifest abuse." (*Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 40 [143 Cal.Rptr. 365].)

The Board chose not to "approve" specific sites in the FEIR, but to reserve that decision, and compliance with CEQA thereon, to the project EIR's, two of which were being considered almost concurrently with the FEIR. In an analogous situation regarding selection of a school site, one court stated: "Given that the District here must thoroughly assess all reasonable alternative sites in its EIR, we cannot say the District manifestly abused

---

[6] " 'Approval' means the decision by a public agency which commits the agency to a definite course of action." (Guidelines, § 15352, subd. (a).)

[7] These six projects were not ancillary elements of a large unified project, for which alternatives need not be considered, as was presented in *No Oil, Inc.* v. *City of Los Angeles* (1987) 196 Cal.App.3d 223 [242 Cal.Rptr. 37] and *Big Rock Mesas Property Owners Assn.* v. *Board of Supervisors* (1977) 73 Cal.App.3d 218 [139 Cal.Rptr. 445].

its discretion in deciding to prepare an EIR after it had selected the preferred site. A certain harmony in line with the fundamental purpose of CEQA is achieved by not judicially disrupting the timing sequence at issue here. Under that sequence, . . . the public are afforded a thorough assessment in the EIR of all reasonable alternative sites while the District's discretion is preserved over the delicate problem of deciding when to prepare the EIR." (*Stand Tall, supra*, 235 Cal.App.3d at p. 781.)

The FEIR states that it desires to consider "a broad range of policy alternatives for the overall development of the Port" to permit the Board "to consider alternative directions for the Port independent of particular projects." We find no abuse of discretion in the Board's decision to tailor PMP 90 and the FEIR to a consideration of alternatives to the overall five-year plan, which included the six "anticipated projects," while reserving without limitation the approval of each "anticipated" project and its location to the project EIR.

The concept of tiering supports allowing the agency and the public to first decide whether it is a good idea to increase Port capacity in a given five-year period at all, or by means of the six "anticipated projects." If that decision is made in the affirmative then each individual project can be reviewed in-depth on its merits in a project EIR with no weight claimed for any supposed "approval" of the individual project or "planning" of its location. On the other hand, if the agency rejects the overall goal then further consideration of the six "anticipated" projects can be dropped.

This approach simply recognizes the agency's discretion on "timing" of the presentation of EIR's. Since no "approval" of specific projects or sites took place in the FEIR, the Board had the discretion to choose the project EIR's as the time to consider alternatives to the individual projects and sites.

d. *Alternative to the Overall Project*

█ We disagree that the FEIR had to consider alternative sites for the landfill "in the entire region rather than in the Port itself." The general plan of the City of Long Beach designates the Long Beach Harbor as a planning district to be governed by the PMP. The statutes mandate that "highest priority" be given to "the use of existing land space within harbors for port purposes[.]" (Pub. Resources Code, § 30708, subd. (c).)[8] The city and the Board are not required to rethink where the Port is to be located every time

---

[8]"The location of the commercial port districts within the State of California . . . are well established . . . . Existing ports . . . shall be encouraged to modernize and construct

they make a short term amendment to a master plan. The Supreme Court concluded that a county "could properly find that a property located outside of its decision making authority was not a feasible project alternative." (*Citizens of Goleta Valley, supra*, 52 Cal.3d at p. 575.)

We also find no defect in the alternatives being weighed with respect to the Port's needs or desires to handle more commercial shipping. The Supreme Court upheld an EIR which rejected various sites as simply unsuitable for successfully operating a beach-front resort hotel. (*Citizens of Goleta Valley, supra*, 52 Cal.3d at p. 561.) In determining the "nature and scope of alternatives to be examined in an EIR, the Legislature has decreed that local agencies shall be guided by the doctrine of 'feasibility.'" (*Id.* at p. 565.) "'Feasible'" means "capable of being accomplished in a successful manner within a reasonable period of time" taking into account various factors including "economic." (Pub. Resources Code, § 21061.1.) Indeed, the Guidelines provide that the only alternatives that need be described are those "which could feasibly attain the basic objectives of the project." (Guidelines, § 15127, subd. (d).)

We reject the Larson Parties' contention that the FEIR was required to consider the alternative of utilizing the naval station on the possibility it might be closed by the United States Government. PMP 90 was a five-year plan covering the period from 1990 through 1995. What is reasonably feasible must be decided in light of the nature of the project and as of the time the FEIR is adopted. The availability of the naval station in the relevant time frame was speculative. An EIR "need not consider an alternative whose . . . implementation is remote and speculative." (Guidelines, § 15126, subd. (d)(5).) The fact that the longer-range facilities master plan of the Port considered this alternative is irrelevant. For the same reasons, the Port and the city were not required to consider as an alternative to PMP 90 whether the Port should be merged with the Port of Los Angeles.

The Larson Parties claim that the FEIR was required to consider the alternative of retaining private ownership at certain project sites. ■ The form of property ownership of a project is not an alternative to the project, but is simply an ancillary facet of a project, for which alternatives need not be considered in an EIR. (Cf. *No Oil, Inc., supra*, 196 Cal.App.3d 223 and *Big Rock Mesas Property Owners Assn., supra*, 73 Cal.App.3d 218.)

■ No ironclad rules can be imposed regarding the level of detail required in the consideration of alternatives. EIR requirements must be

necessary facilities within their boundaries . . . ." (Pub. Resources Code, § 30701, subd. (b).)

"sufficiently flexible to encompass vastly different projects with varying levels of specificity." (*Rio Vista Farm Bureau Center* v. *County of Solano* (1992) 5 Cal.App.4th 351, 374 [7 Cal.Rptr.2d 307].) The degree of specificity required in an EIR "will correspond to the degree of specificity involved in the underlying activity which is described in the EIR." (Guidelines, § 15146.) Thus, ". . . an EIR on the adoption of a general plan . . . must focus on secondary effects of adoption, but need not be as precise as an EIR on the specific projects which might follow. [Citations.]" (*Rio Vista, supra,* 5 Cal.App.4th at p. 374.) ▮ The consideration of alternatives in this FEIR was adequate for its purposes.

### 5. The Consideration of Cumulative Impacts

#### a. The Supposed Deficiencies

The trial court held that "the discussion of cumulative impacts is inadequately concrete and quantitative although substantial data existed." The statement of decision does not identify any particular information lacking in the FEIR, although it indicates that an EIR "must consider reasonably foreseeable future projects" and that it reviewed the two project specific EIRs to see what information was "feasible" to present.

The Larson Parties argue that there was relevant information available in the two concurrent project EIR's that was not included in the FEIR; that analysis of cumulative impacts was improperly deferred to project EIR's; and that there was inadequate consideration of other Port and non-Port projects. We disagree.

#### b. The Deferral of Analysis

The FEIR states that it "focuses on a general overview of cumulative impacts. These cumulative impacts and associated mitigation measures will [be] addressed in further detail as part of the environmental review of specific projects." The Larson Parties view this as a concession that the CEQA requirement to discuss cumulative impacts has been ignored.

▮ While an FEIR cannot defer all consideration of cumulative impacts to a later time, it may legitimately indicate that more detailed information may be considered in future project EIR's. " 'Tiering' " refers to "the coverage of general matters in broader EIRs (such as on general plans . . .) with subsequent . . . site-specific EIRs . . . concentrating solely on the issues specific to the EIR subsequently prepared." (Guidelines, § 15385.)

An FEIR need only conform with the general rule of reason in analyzing the impact of future projects, and may reasonably leave many specifics to

future EIR's. "CEQA recognizes that environmental studies in connection with amendments to a general plan will be, on balance, general." (*Schaeffer Land Trust* v. *San Jose City Council* (1989) 215 Cal.App.3d 612, 625 [263 Cal.Rptr. 813].)

Deferral of more detailed analysis to a project EIR is legitimate. It has been held that "where practical considerations prohibit devising such measures early in the planning process (e.g., at the general plan amendment or rezone stage), the agency can commit itself to eventually devising measures that will satisfy specific performance criteria articulated at the time of project approval. . . [Citation.]" (*Sacramento Old City Assn.* v. *City Council* (1991) 229 Cal.App.3d 1011, 1029 [280 Cal.Rptr. 478].)

c. *The Project EIR Information*

 The fact that the two project-specific EIR's contained more detailed information than the FEIR on those projects, does not render the FEIR inadequate. An EIR on an amendment to a local general plan "should focus on the secondary effects that can be expected to follow from the . . . amendment, but the EIR need not be as detailed as an EIR on the specific construction projects that might follow." (Guidelines, § 15146, subd. (b).) An EIR on the adoption of a general plan "need not be as precise as an EIR on the specific projects which might follow." (*Rio Vista, supra,* 5 Cal.App.4th at p. 374.)

The only specific information contained in the project EIR's which the Larson Parties identify as omitted from the FEIR are "construction costs and employment for the West 7th Street Terminal Expansion Project." In a discussion of the cumulative employment impacts of all the development areas surrounding the Port, the FEIR considered the six projects in PMP 90 in addition to eleven other projects in the city. The FEIR concludes that, cumulatively, the projects will have a significant impact on regional employment levels in the construction industry and presents an average construction salary and a formula to derive employment from construction costs. In this context, it presents a list of projects with estimated costs and construction employment. Figures for five of the projects are listed as not available, including the West 7th Street Terminal Expansion.

An estimate of the costs for the West 7th Street Terminal Expansion Project was contained in the project EIR. To make the FEIR completely accurate, this estimate should have been included. However, its inclusion could only bolster the overall conclusion of the FEIR that the projects would create "a net gain or a positive addition to the total employment levels of the regional area construction industry."

"Absolute perfection is not required"; instead the level of analysis "is subject to a rule of reason." (*Laurel Heights, supra,* 47 Cal.3d at pp. 406, 407.) The relevant inquiry is whether there has been "a prejudicial abuse of discretion." (Pub. Resources Code, § 21168.5.) The absence of information in an EIR "does not per se constitute a prejudicial abuse of discretion. [Section 21005.] A prejudicial abuse of discretion occurs if the failure to include relevant information precludes informed decisionmaking and informed public participation, thereby thwarting the statutory goals of the EIR process. [Citation.]" (*Del Mar Terrace Conservancy, Inc.* v. *City Council* (1992) 10 Cal.App.4th 712, 730 [12 Cal.Rptr.2d 785], italics omitted.) There is "no presumption that error is prejudicial." (Pub. Resources Code, § 21005.) ▮▮▮▮ We find that the omission described could have no material effect on informed decisionmaking or informed public participation and was not prejudicial.[9]

### d. *The Consideration of Port and Non-Port Cumulative Impacts*

Contrary to the assertion of the Larson Parties, an EIR need not include all information available on a subject. An EIR should be "analytic rather than encyclopedic" and should emphasize portions "useful to decision-makers and the public." (Guidelines, § 15006, subds. (o) & (s).) One goal in reducing delay is "[r]educing the length of" EIR's. (Guidelines, § 15006, subd. (n).) An EIR is an "informational" document designed to convey detailed information to public agencies "and the public in general." (Pub. Resources Code, § 21061.)

CEQA simply requires that the public and public agencies be presented with adequate information to ensure that "decisions be informed, and therefore balanced." (*Citizens of Goleta Valley, supra,* 52 Cal.3d at p. 576.) The purpose of CEQA "is not to generate paper[.]" (*Id.* at p. 564.)

▮▮▮▮ While section IX "Cumulative Impacts" of the FEIR covers only slightly more than three pages and is conclusory in some respects, adequate detail and analysis for its purposes are contained throughout the document, but especially in the eight-page, section I "Executive Summary" and the approximately thirty-five pages of analysis and data in Section IV "Environmental Analysis," under the subheadings of "Impacts" and "Mitigation." If the EIR, "read as a whole, adequately deals with the question of cumulative impacts, it will suffice." (*Whitman* v. *Board of Supervisors* (1979) 88 Cal.App.3d 397, 411, fn. 7 [151 Cal.Rptr. 866].)

---

[9]In light of this conclusion, the argument of the Board that the Larson Parties failed to exhaust their administrative remedies regarding incorporation of the specific project EIR's into the FEIR is moot.

The issue is whether the Board reasonably and in good faith discussed the cumulative impacts in detail sufficient for its purpose so that the public could discern from the FEIR the "analytic route the . . . agency traveled from evidence to action." (*Topanga Assn. for a Scenic Community, supra,* 11 Cal.3d at p. 515.) The sufficiency of any EIR is judged "in the light of what is reasonably feasible. . . . The courts have not looked for perfection but for adequacy, completeness, and a good faith effort at full disclosure." (Guidelines, § 15151.)

The FEIR's discussion of cumulative impacts is strongest with respect to "Socioeconomic" factors and is generally adequate with respect to the discussion of the cumulative impacts of the six anticipated projects in PMP 90 and the other Port projects. It is weakest in separately identifying and detailing the cumulative impacts of the non-Port projects with respect to air quality and transportation.[10]

The FEIR concludes that "[c]onstruction and operation of the cumulative projects would result in increased air emissions that would contribute to the already high levels of air pollutants within the South Coast Air Basin." The FEIR states that "non-port baseline traffic is also expected to increase substantially" and concludes that "[c]umulative transportation impacts are considered significant." While the FEIR might preferably have provided a more separate detailed discussion of the non-Port contribution to cumulative impacts in these areas, the FEIR "did not minimize or ignore the impacts." (*Sacramento Old City Assn., supra,* 229 Cal.App.3d at p. 1028.)

The Larson Parties do not identify, or even suggest, any manner in which the omission of more detailed information underlying the Board's conclusions on these subjects mislead the agency or the public, omitted or understated any problem, or was prejudicial in any way. As previously indicated, the absence of information in an EIR "does not per se constitute a prejudicial abuse of discretion." (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 712 [270 Cal.Rptr. 650].) The Larson parties have the burden of proving that the FEIR is inadequate under CEQA. (*State of California, supra,* 222 Cal.App.3d at p. 1419.) We are also mindful of the

---

[10]The FEIR gives an overall picture of these non-Port projects. It indicates that the non-Port anticipated projects have estimated construction costs of $1.83 billion and involve expansion of a convention center and the addition of 1,900 residential units, 900 hotel rooms, a theater, 300,000 square feet of retail development and over 2 million square feet of office space in downtown Long Beach. While there is considerable detailed discussion and analysis regarding air quality and transportation, and cumulative impacts thereon, there is little discussion quantifying what the contribution of the non-Port projects is to cumulative impacts in these areas.

Supreme Court's caution "that rules regulating the protection of the environment must not be subverted into an instrument for the oppression and delay of social, economic, or recreational development and advancement." (*Citizens of Goleta Valley, supra,* 52 Cal.3d at p. 576.)

We find that the discussion of cumulative impacts in the FEIR, viewing the document as a whole, substantially complies with CEQA.

### 6. *Attorney Fees*

Since the Larson Parties were not "a successful party" in this action, they are not entitled to an award of attorney fees under Code of Civil Procedure section 1021.5. (*Save Our Residential Environment, supra,* 9 Cal.App.4th at p. 1754.)[11]

### DISPOSITION

The judgment and order granting the writ of mandate and the order awarding attorney fees and costs are reversed and the trial court is ordered to enter judgment for the Board.

The Board is awarded its costs of appeal.

Croskey, Acting P. J., and Kitching, J., concurred.

The petition of plaintiffs and appellants for review by the Supreme Court was denied December 2, 1993.

---

[11]Even if the Larsons Parties were somehow viewed as "successful" parties, the award of attorney fees would have to be reversed since the Larson Parties wholly failed to present any evidence, or inferences therefrom, to the trial court on the issue of whether the necessity for pursuing the litigation placed a burden on them out of proportion to their individual stake in the matter as required under *Beach Colony II, supra,* 166 Cal.App.3d 106 and *Luck* v. *Southern Pacific Transportation Co.* (1990) 218 Cal.App.3d 1, 30 [267 Cal.Rptr. 618]. Indeed, counsel for the Larson Parties conceded at oral argument that no such disproportion could be established.