Filed 1/27/21  Protect Our Homes and Hills v. County of Orange CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| PROTECT OUR HOMES AND HILLS et al., <br><br>     Plaintiffs and Appellants, <br><br>       v. <br><br> COUNTY OF ORANGE et al., <br><br>     Defendants and Respondents; <br><br> YORBA LINDA ESTATES, LLC, <br><br>     Real Party in Interest and Respondent. | G058339 <br><br> (Super. Ct. No. 30-2018-01027875) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, William D. Claster, Judge.  Affirmed.

Kevin K. Johnson APLC, Kevin K. Johnson and Jeanne L. MacKinnon for Plaintiffs and Appellants.

Leon J. Page, County Counsel, and Nicole M. Walsh, Deputy County Counsel for Defendants and Respondents.

Remy Moose Manley, James G. Moose and Nathan O. George for Real Party in Interest and Respondent.

# INTRODUCTION

This appeal calls on us to one last time assess the County of Orange's (the County) compliance with the California Environmental Quality Act, Public Resources Code section 21000 et seq. (CEQA), in connection with a residential development project (the Project) adjacent to a state park and the City of Yorba Linda (the City).[1]

Protect Our Homes and Hills and others (collectively, Protect) again ask us to reverse the September 26, 2018, decision by the County Board of Supervisors (Board) to certify the Second Revised Final Environmental Impact Report No. 616 (the 2018 EIR) and reapprove the Esperanza Hills Specific Plan and related entitlements for the Project.

Much like the three prior appeals, Protect once more contends the County failed to comply with CEQA in multiple respects. Protect also contends the County failed to comply with the Subdivision Map Act, Government Code section 66410 et seq. (SMA). We find no merit in any of these contentions and affirm the challenged order.

The heart of this appeal concerns alternative ingress and egress routes. Given the terrain and the presence of the state park, there are only two practical directions for roads leading in and out of the Project. The first is a southerly route (Option 1), connecting to a smaller east-west semicircular road, Stonehaven Drive. The second is a westerly route (Option 2), connecting to an existing larger north-south road, San Antonio Road. These two routes correspond to the two basic road configuration options (& their various slightly modified incarnations) discussed in the multiple EIR's in this case.

Looking at fire evacuation—or even just traffic—in a vacuum, the obvious and most preferable option would be to build roads to *both* San Antonio and Stonehaven.

---

[1] All undesignated statutory references are to the Public Resources Code, and all Guidelines or regulatory references are to title 14 of the California Code of Regulations.

But there are other considerations. Building any road to the west would require much more grading than any road to the south, and would disrupt the habitat of two endangered species, the California Gnatcatcher and the Least Bell's Vireo.

Despite the presence of the California Gnatcatcher and the Least Bell's Vireo in the path of the westerly route, Protect chiefly claims the 2018 EIR should have *expressly* compared the Option 1 southerly route with a westerly route called "Option 2 Modified" in the briefing. We disagree, for reasons which we will explain in detail later.

In brief, the presence of the two endangered species constitutes substantial evidence in the administrative record that a westerly route is *practically* infeasible. (See Guideline § 15126.6 [EIR need not discuss infeasible alternatives].) By contrast, a southerly route would have no significant unmitigated environmental effects.

## FACTS AND PROCEDURAL HISTORY

A. *The Project and the Surrounding Areas*

Below is a site plan for the Project showing both a westerly route and a southerly route. It is taken from the revised final EIR of November 2016 (the 2016 EIR), where it was described as "Option 2B".



Likewise, below is a map from the 2016 EIR. It shows the Project in relation to the state park and the existing streets, including San Antonio and Stonehaven:



To explain the record and briefing better, we note the location of the very short street (highlighted in green), off the side of San Antonio, called Aspen Way. In the record (& in Protect's briefing) the westerly route is sometimes described as the "Aspen" route rather than the San Antonio route.

We also note there are two other future residential developments to the west of the Project, marked on the above map as Cielo Vista (about 112 single family homes) and Bridal Hills (about 38). The relevance of the proposed Cielo Vista development will become apparent later.

B. *The Earlier Appeals*

The Project has generated three prior appeals seeking review of the EIRs certified by the County. Here is a quick recap:

(1) (*Protect Our Homes & Hills et al. v City of Orange et al.* (Oct. 13, 2017, G054185) [nonpub. opn.]; *Protect I.*) A draft EIR had been circulated in 2013 (the 2013 EIR), which became the basis for a final EIR which the County certified in 2015 (the 2015 EIR). Protect challenged the 2015 EIR.[2] The trial court concluded the 2015 EIR was deficient for failing to consider all feasible mitigation measures concerning the greenhouse gas impacts from the Project, but otherwise concluded the 2015 EIR passed muster. Included in the parts that the trial court approved was a fire hazards analysis which discussed both Option 1 and Option 2. The analysis found *either* option sufficient to meet the safety requirements of the Orange County Fire Authority (OCFA).

Protect appealed. It did not raise any argument contesting the 2015 EIR's finding that either Option 1 or Option 2 was sufficient for fire evacuation. Protect did, however, raise and win three other issues: (a) The final EIR failed to adequately describe the state park; (b) it deferred mitigation of fire hazards, including evacuation planning (but not involving the problem of which evacuation routes should be employed); and (c) it failed to address the total projected water consumption of the Project.

(2) (*Protect Our Homes & Hills et al. v. City of Orange et al.* (May 8, 2019, G055716) [nonpub. opn.]; *Protect II.*) This appeal involved the 2016 EIR. On appeal we held that the 2016 EIR lacked evidence that requiring solar panels on each home was infeasible. This deficiency, however, was severable. So, the Project could still go forward, and the deficiency could be resolved by a "further revised FEIR." (*Protect II,* at pp. 1, 4, 9].)

(3) (*Protect Our Homes & Hills et al. v. City of Orange et al.* (Feb. 25, 2020, G057422) [nonpub. opn.]; *Protect III.*) This appeal involved the 2018 EIR. Protect asserted the 2018 EIR still did not complywith the three deficiencies identified in

---

[2] The Project has generated four EIR's: The 2013 EIR, the 2015 EIR, the 2016 EIR, and the 2018 EIR at issue in this case.

*Protect I*.  (*Protect III*, at p. 3].)  This court disagreed and held the 2018 EIR was sufficient and no recirculation was necessary.  (*Id*. at at pp. 7-8].)

C.  *The Instant Appeal and the Underlying Trial Court Proceedings*

Like *Protect III*, this appeal involves an attack by Protect on an aspect of the 2018 EIR.

Preliminarily, a complicated aspect of the record, going back to 2015, must be clarified.  As the site plan and map reproduced above shows, the 2015 EIR did compare westerly routes under the general heading of Option 2A and Option 2B with the southerly route Option 1.  Option 2B was a two-road option, including both the westerly and southerly routes.  The 2015 EIR pointed out that under Option 2B the primary way into the Project would be from San Antonio with "secondary" access via Stonehaven.[3] But as distinguished from "Option 2B," the 2015 EIR did not expressly mention anything called "Option 2 Modified."  The phrase is nowhere found in it.

However, a late May 2015 memo from CAA Planning to the County contract planner compared a route that had already been analyzed in the EIR's—the aforementioned two-road "Option 2B"—with a "modified access configuration" that was "under consideration" at the time.  That particular variant of Option 2B is described in the

---

[3] The 2015 EIR stated:  "Access Option 2B Access Alternative - This Alternative provides access via San Antonio Road approximately 1,850 feet south of Aspen Way, and via Stonehaven Drive. The San Antonio Road access will be the primary access with secondary access via Stonehaven Drive."

briefing as "Option 2 Modified." "Option 2 Modified" is very close to Option 2B as it was described in the 2015 EIR.[4]

Despite its omission from the 2015 EIR, Option 2 Modified was added to the County Specific Plan for the area by resolution of June 2, 2015. It was Option 2B, as distinct from Option 2 Modified, that the 2015 EIR stated was "superior" to any of the one-direction alternatives.[5]

But then a 2016 survey of the adjacent Cielo Vista site showed the presence of both the California Gnatcatcher and the Least Bell's Vireo. The United States Fish and Wildlife Service (the US Wildlife Service) told the Cielo Vista developer it preferred avoidance of endangered species and that off-site mitigation was not available. The Board was apprised of this development at a December 2016 Board meeting where staff told the supervisors the proposed road across Cielo Vista (i.e., the westerly route) would destroy habitat occupied by California Gnatcatchers. A letter from the US Wildlife Service reiterated priority should be given to avoiding those impacts rather than trying to mitigate those impacts afterwards. One Board member even remarked the Project developer (Developer) would be "stuck in purgatory" if a two-road option were pursued.

---

[4] From the CAA memo: "*Option 2, as analyzed in the FEIR, included two roadways*. The difference between the modified Option 2 and the Option 2 presented in the FEIR is that the former *emergency-only access to Stonehaven Drive would be widened and would serve as a secondary access point*. As stated, this is very similar to Option 2B, Alternative 3*. Option 2 – Modified Aspen Way access would result in fewer environmental impacts compared to Access Option 2B, Alternative 3 including less grading, and fewer impacts to biological resources. Similarly, compared to Option 2 analyzed in the FEIR, Option 2 - Modified Aspen Way access would redistribute a portion of vehicular traffic to the secondary access point at Stonehaven Drive, thereby reducing the traffic noise analyzed in Option 2." (Italics added.)

[5] Referring to Option 2B, the 2015 EIR said: "This Alternative is superior in the area of community evacuation in the event of a fire. The two access points provide an opportunity for traffic to be diverted in two directions towards either Yorba Linda Boulevard (east-west) or San Antonio Road (north-south)."

The upshot was that in May 2017 the Board approved the 2016 EIR that included Option 1A.[6] However, in October of the same year we vacated the Board approval of the 2016 EIR in *Protect I*.

In September 2018 the Board certified the 2018 EIR, reapproving the Project, and again adopting the southerly Option 1A. The Board thought no recirculation was necessary. Protect then filed this petition for writ of mandate, mainly based on the lack of a "head to head" comparison of the two-road Option 2 *Modified*—as distinct from Option 2B—with the option adopted in the 2018 EIR, Option 1A.

At trial, Protect emphasized Option 2 Modified was a *mitigation* measure previously adopted in an earlier EIR and argued it could not be dropped in a later EIR without some explicit explanation. The County and Developer stressed Option 2 Modified never was an "alternative" to the Project in the first place.

The trial judge questioned why any discussion of Option 2 Modified was necessary at all given that the southerly route, Option 1A, had been found not to have *any* substantial environmental impacts that needed any mitigation.

The trial judge issued a thorough (15 page) statement of decision rejecting Protect's claims. He noted the main challenge mounted by Protect was centered on the "access alternative known as Option 1A." He stated there was no question the 2015 EIR had analyzed all three access permutations: a southerly route via Stonehaven, a westerly route via San Antonio, and a combination of the two. And the 2015 EIR recognized the obvious: Two roads are "superior" for fire evacuation. Two roads, however, were "considered no longer feasible" by 2017, so the Board approved Option 1A instead.

---

[6] The variations within Option 1 are not relevant to this appeal. All Option 1 variations are southerly routes that do not entail any significant environmental effects. That said, evidence in the administrative record showed Option 1A was an improvement over Option 1 since it requires less grading and preserves more open space. Option 1A also cannot be called a "single access" option in terms of fire evacuation. It has a full-time regular road for the residents and an emergency access road for fire evacuations.

9

Going to the heart of this appeal, the trial court noted all of the access options had been analyzed and each one of them had been "determined to have less than a significant environmental impact." The trial court then found that because the option chosen had no significant environmental impacts, no analysis of Option 2 Modified was necessary, citing, inter alia, *South County Citizens for Smart Growth v. County of Nevada* (2013) 221 Cal.App.4th 316, 333 (*South County Citizens*).

The trial court reasoned, "[T]he County had no obligation under CEQA to analyze the feasibility of *any* of the access options once it was determined that all of them had less than a significant environmental impact. On this basis alone, Protect's challenge to the lack of feasibility findings regarding Option 2 Modified fails."

The judge also determined the administrative record showed the Board was quite aware of the presence of the California Gnatcatcher in the path of the westerly option. Thus, "there [did] not appear to be any legitimate dispute that Option 1A was environmentally superior from a biological impact standpoint. Protect cite[d] no evidence to the contrary."

Protect had also brought an ancillary attack on the Project under the SMA, asserting the vesting tentative tract map (VTTM) approved for the Project was deficient because Developer did not have control over the land for Option 1A. In response, the trial court found substantial evidence Developer *did* have such control, in the form of an easement it owned together with the City's agreement an open space easement the City had over the same land could be used to build such a road.

Protect timely appealed from the final order denying the writ of mandate.

## DISCUSSION

A. *Protect's Challenge to the 2018 EIR Itself*

EIRs are required by section 21100. It specifies that EIR's shall discuss both "[a]lternatives to the proposed project" and "[m]itigation measures proposed to minimize significant effects on the environment."[7]

Protect's appeal attacks the absence of an explicit analysis of Option 2 Modified in the 2018 EIR. The necessary premise to its argument is that Option 2 Modified comes within the CEQA definition of either a project alternative or a mitigation measure.[8]

1. *Option 2 Modified as an "Alternative"*

We first consider whether Option 2 Modified can properly be called a "project alternative."[9]

_____

[7] Section 21100 provides in relevant part: "(a) All lead agencies shall prepare, or cause to be prepared by contract, and certify the completion of, an environmental impact report *on any project which they propose to carry out or approve that may have a significant effect on the environment*. Whenever feasible, a standard format shall be used for environmental impact reports. [¶] (b) The environmental impact report shall include a detailed statement setting forth all of the following: [¶] . . . [¶] (3) Mitigation measures proposed to minimize *significant effects on the environment*, including, but not limited to, measures to reduce the wasteful, inefficient, and unnecessary consumption of energy. [¶] (4) Alternatives *to the proposed project*." (Italics added.)

[8] At trial, Protect's counsel spoke of project alternatives and mitigation measures as practically synonymous: "Mr. Johnson: And . . . they didn't go head to head with 1(A) and compare the two in terms of what was better, from a mitigation standpoint. From an alternative standpoint."

[9] At various points in its briefing, Protect characterizes Option 2 Modified as an "alternative." In its characterization of the trial, for example, Protect frames the main CEQA issue as: "Briefing and hearing dealt primarily with: 1) whether County could approve a previously rejected, modified version of the Project without conducting a comparative impacts and feasibility analysis with *a previously adopted Alternative*, formally circulating the [2018 EIR] or preparing a supplemental or subsequent EIR ('SEIR')." (Italics added.)

"Alternative" is not specifically defined in CEQA. (See § 21060 et seq.) It is a word that requires context for its meaning. Alternative *to what*?

CEQA's express language is alternative "*to the proposed project.*" (See § 21100, subd. (b)(4), italics added.). Here, case law sheds some light on CEQA's meaning. The pioneering case on the need to analyze alternatives to a project, *Laurel Heights I*, discussed an EIR that used a very simple rubric to discuss project alternatives: no project, off-site alternative, on-site alternative. (See *Laurel Heights I* (1988) 47 Cal. 3d 376, 403.) The problem with the EIR in *Laurel Heights I* was it "barely" identified, much less discussed, the off-site and on-site alternatives. (*Ibid.*)

But by the 2000's preparers of EIR's had learned to be more specific. For example, in *Sierra Club v. City of Orange* (2008) 163 Cal.App.4th 523 (*Sierra-Orange*) the EIR discussed nine alternatives to a series of planned communities in the Santiago Hills in Northeastern Orange County. Those included no project, keeping existing general plan and zoning in place (which also meant no project), allowing significant commercial development, reduction of density in a certain area, and increased density in other areas while completely eliminating any housing in the certain area. (*Id.* at p. 545.)

Is it reasonable to call Option 2 Modified an "alternative" to the Project? We think not. By contrast with *Laurel Heights I* and *Sierra-Orange*, "Option 2 Modified" is simply an alternative *road configuration* to a project that has otherwise gelled. Option 2 Modified is better described as a possible "facet" of the Project rather than an alternative to it, since its very existence depends on the Project.

And an EIR need not discuss the "facets" of a project "such as grading and access roads." (*Property Owners Assn. v. Board of Supervisors* (1977) 73 Cal.App.3d 218, 227.) (Accord *California Native Plant Society v. City of Santa Cruz* (2009) 177 Cal.App.4th 957, 993; *Al Larson Boat Shop, Inc. v. Board of Harbor Commissioners* (1993) 18 Cal.App.4th 729, 745 ["ancillary facet" is "not an alternative to the project"].)

Thus, no discussion of Option 2 Modified was needed in the 2018 EIR.

Our conclusion remains the same, however, even if we assume, for sake of argument, that Option 2 Modified truly is an "alternative" to the Project.

First, the differences between Option 2 Modified and Option 2B are too small to require separate discussion of Option 2 Modified.[10] Option 2 Modified is certainly not "considerably different" from the Option 2B "previously analyzed." (See *Sierra Club v. County of Napa* (2004) 121 Cal.App.4th 1490, 1497.)

Second, Option 2 Modified has turned out to be practically infeasible by the discovery of California Gnatcatcher and Least Bell's Vireo habitat that would be disrupted. And an EIR need not discuss practically infeasible alternatives. CEQA Guidelines, section 15126.6(a) says an EIR "shall describe a range of reasonable alternatives to the project, or to the location of the project, which would *feasibly* attain *most of the basic objectives* of the project"; an EIR "must consider *a reasonable range of potentially feasible alternatives* that will foster informed decisionmaking and public participation"; and an EIR "*is not required to consider alternatives which are infeasible*." (Italics added.)

Feasibility is defined under CEQA to mean "capable of being accomplished in a successful manner *within a reasonable period of time*, taking into account economic, environmental, social, and technological factors." (§ 21061.1, italics added.)

Against the problem that the presence of endangered species habitat makes Option 2 Modified practically infeasible, Protect asserts the County simply swallowed whole Developer's assertion of infeasibility without exercising its own independent judgment as to the possibility of mitigation. Not so.

---

[10] We note that even in its own briefing, Protect itself often treats Option 2B and Option 2 Modified as synonymous.

Given that Protect does not dispute the finding endangered species habitat would be disrupted by Option 2 Modified, its argument on this point must fail. The County *didn't* take Developer's word for it. The County planning director contacted the US Wildlife Service directly and learned Developer's characterization of the mitigation possibilities were "generally accurate." One Board supervisor even contacted the US Wildlife Service himself and was told the US Wildlife Service was not sure that it would be *possible* to mitigate.[11]

In any event, Protect ignores that any attempt at mitigation involving an endangered species would expose the Project to considerable delay—"X millions of dollars" as the supervisor just quoted in a footnote put it. A mitigation plan would have to be developed, and it takes no imagination to foresee that any such plan would itself be attacked, maybe even by Protect itself, maybe by other parties.

Plus, trying to mitigate a westerly route would also entail going through a whole new government agency. Years of wrangling would lie ahead over whether the description of any attempted mitigation would be accurate or supported by substantial evidence. Indeed, the US Wildlife Service could not guarantee that a "mitigation bank" would even be available for the Project. To sum up, any attempt at mitigating the environmental impact of a westerly route had "unreasonable delay" written all over it.

---

[11] The supervisor said at a 2017 Board meeting: "I talked to U.S.Fish & Wildlife and California Fish & Wildlife and some of the other regulatory agencies, -- the Aspen Way ingress point, to me, just – it – while it would be great to have it, I think it provides a number of very significant challenges for the region, for the – for this project. It's expensive at, you know, X millions of dollars. But in addition to that, and I think more importantly, are the areas with regard to mitigation. In talking to U.S. Fish & Wildlife, for instance, it was mentioned that, well, yes, you could mitigate for the gnatcatcher, and that's great, but you've got to be able to go to a mitigation bank. And they weren't quite sure – there were 20 acres in one bank that might be available, but there were two applicants that had already put in applications for those properties. So they weren't sure that any mitigation property would even be available."

## 2. *Option 2 Modified as a "Mitigation Measure"*

We next consider whether Option 2 Modified can be properly characterized as a "mitigation measure" that was previously incorporated into an EIR but somehow got lost in the shuffle over the years.

This brings us to Protect's central argument in this appeal—that Option 2 Modified comes within the rule that once a "mitigation" condition has been adopted in an EIR, it can't be dropped later without explanation. (See *Lincoln Place Tenants Assn. v. City of Los Angeles* (2005) 130 Cal.App.4th 1491, 1509 (*Lincoln Place*); *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1404; accord *Napa Citizens for Honest Government v. Napa County Bd. of Supervisors* (2001) 91 Cal.App.4th 342, 359.)

Mitigation is defined in Guideline section 15370 which provides: "'Mitigation' includes: [¶] (a) Avoiding the impact altogether by not taking a certain action or parts of an action. [¶] (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. [¶] (c) Rectifying the impact by repairing, rehabilitating, or restoring the impacted environment. [¶] (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. [¶] (e) Compensating for the impact by replacing or providing substitute resources or environments." For our purposes, the key word in the regulation is "impact." So here, a mitigation measure is something that avoids or otherwise ameliorates the adverse environmental "impact" *of the Project*.

Intuitively, one might think Option 2 Modified, like the other option 2 two-road configurations, *is* a "mitigation measure;" that is, a mitigation measure designed to cut down on the adverse traffic impact of the Project. But such a characterization, as the trial court astutely recognized, runs aground on this undisputed fact: There are no adverse environmental impacts even for the Option 1 southerly configurations.

Stated differently, if the "project" were considered simply as a southerly route to Stonehaven, there would not be any significant adverse environmental impacts to "mitigate." Thus, just as the Option 2 Modified road configuration cannot be considered an "alternative to the project" to be discussed, neither can it be considered a "mitigation measure" requiring discussion either.

But again, even if we assume, for sake of argument, Option 2 Modified were a "mitigation measure," explicit discussion of it in the 2018 EIR would not be necessary, because "[a]n EIR need not identify and discuss mitigation measures that are infeasible." (*Clover Valley Found. v. City of Rocklin* (2011) 197 Cal.App.4th 200, 244; see also Guidelines § 15126.6, subd. (a).)

Moreover, Option 2 Modified does not fit within the lost-in-the-shuffle-of-years scenario exemplified by *Lincoln Place*. *Lincoln Place* centered on a garden apartment complex in Venice Beach. In the early 1990's the owner wanted to replace the complex with a group of new condos, apartments and townhomes. The tenants, who knew they had a good thing going—relatively inexpensive apartments near the beach— fought hard against the project. Their main line of attack was the assertion that the apartment complex, built in 1951, had architectural and historical significance. The Los Angeles Planning Commission was not impressed with the case for historical preservation, but as a kind of backstop adopted in a 1994 EIR three mitigation measures: *photographs* of the interiors, *drawings* made of each type of unit and overall site plan, and the *offering* for sale of the structures themselves for "removal to a new location." (*Lincoln Place, supra*, 130 Cal.App.4th at p. 1498.)

The tenants then argued the project would diminish the amount of affordable housing in the area. After prolonged litigation, they lost. Demolition was imminent. But then someone noticed that the original EIR had imposed those three measures in mitigation. There was no explanation as to why those mitigation measures should not still be imposed. The result in *Lincoln Place* was that the demolition could

16

not go forward without compliance with those requirements, or at least an explanation as to why they had been dropped.  The theory was the presumption the local agency had imposed the mitigation condition in the first place after due investigation, so "deference" to that original imposition required it not be dropped without explanation.[12]  (*Lincoln Place, supra*, 130 Cal.App.4th at pp. 1498-1509.)

The fundamental reason the *Lincoln Place* rationale does not fit Option 2 Modified is that in *Lincoln Place* there was no reason the original and express mitigation measures of photos, drawing and offering for sale had somehow become infeasible during the ensuing years.  Here, by contrast, there is substantial evidence that Option 2 Modified had become infeasible by the time of the 2018 EIR.

Beyond that, it is a distortion of the record to say that Option 2 Modified was "adopted" as a "mitigation measure."  It was not.  Not even its near-clone, Option 2B, was actually "chosen" in the 2018 EIR.  It was merely included in a land use specific *plan*.  That does not make it a mitigation measure adopted by an EIR.

And again, Option 2 Modified was not considerably different from the option that had been analyzed in the EIR's in this case, Option 2B.  (Guidelines § 15162; *South County Citizens*, *supra*, 221 Cal.App.4th at p. 330 [for alternative to constitute new information it had to be "considerably different from alternatives previously analyzed].)

B. *Protect's SMA and Related Planning and Zoning Challenges*

Protect also argues the VTTM approved by the Board with the 2018 EIR is inconsistent with the specific plan because Developer cannot guarantee it has the rights to build the roads envisioned by the adopted Option 1A.

---

[12]  From *Lincoln Place*:  "'[W]hen an earlier adopted mitigation measure has been deleted, the deference provided to governing bodies with respect to land use planning decisions must be tempered by the presumption that the governing body adopted the mitigation measure in the first place only after due investigation and consideration.'" (*Lincoln Place, supra*, 130 Cal.App.4th at p. 1509.)

This argument is based on the SMA provisions which require tentative tract maps to be consistent with the local specific plan for the area. Government Code section 65455, a simple one-sentence statute states: "No local public works project may be approved, no tentative map or parcel map for which a tentative map was not required may be approved, and no zoning ordinance may be adopted or amended within an area covered by a specific plan unless it is consistent with the adopted specific plan."

Here some additional facts become relevant. Developer's predecessor obtained a blanket easement (the ADI easement) over the land that connects the Project to Stonehaven (lot A of two tracts, 12850 & 12877) back in 1988. The recorded ADI easement specifically provided a perpetual nonexclusive easement for the use of any roadways over the land of the grantor. In approving the VTTM in May 2017, the Board had the confirming testimony of the County surveyor who said the ADI easement was "basically a blanket easement" covering the two tracts.

Protect's argument that Developer cannot use the ADI easement to connect the Project to Stonehaven rests on the fact the land subject to the ADI easement was *also* dedicated as "open space" to the City. Protect asserts the City hasn't given its permission to Developer to put a road on its open space.

We reject this argument because, as the trial court pointed out, there are two letters in the administrative record from the City which can reasonably be read to say the City *has* given permission to put roads on the land covered by its open space dedication.

First, there is a letter dated October 26, 2016 from the City manager in which the City specifically referenced Option 1 Modified—the southerly option—and said the County should require Developer to "prove and show documentation that it has legal access to all property needed (including grading rights) for the primary and emergency access points prior to approving the project." The clear implication of that letter was that the City would not exercise any veto power over the Project if Developer had those rights and here the record shows it has.

18

Second, there is another letter from the City to the County, dated September 18, 2018, providing invited input. In this letter the City makes the same statement about the need for Developer to have all access rights; and the City does so in terms that are unmistakable in its willingness to acquiesce to the Project.[13]

There is also evidence in the administrative record that in January 2016 the City council voted to *forbid* the westerly option to San Antonio, because Developer could not obtain the necessary easements there. And beyond that, there is the proverbial elephant in the room. The City has known of the Project for almost a decade now. It has known of the ongoing litigation brought by Protect, including this most recent round in which the VTTM for the Project has been attacked on the theory Developer could be blocked by the City.

Finally, if the City had wanted to veto the Project it could have intervened in this action and expressly voiced its intention to use its open space dedication to oppose the southerly access into the Project. We therefore conclude there is no inconsistency between the VTTM (with its southerly road configuration) and the County's specific plan.[14]

---

[13] To be sure, the City requested in the 2018 letter a two-road approach to alleviate traffic on Stonehaven. But there is nothing in that letter that indicates a two-road approach was a condition precedent of its approval. The City was making *requests*, in response to the County's solicitation for the City's input. Moreover, it appears the September 26 letter, which is detailed (& addresses many concerns other than traffic), makes no reference to the lack of a viable westerly option because of endangered species habitat. It is reasonable to infer the City simply forgot about the problems with a westerly route when the September 26 letter went out.

[14] To the degree that Protect argues the County failed to comply with the SMA by failing to comply with CEQA, the issue has now been resolved against it.

C. *Waiver of Other Objections to the Plan*

As discussed, Protect's briefing on appeal is limited to two principal issues: (1) alleged noncompliance with CEQA because of the absence of a head-to-head comparison between Option 2 Modified and the variation of Option 1 ultimately chosen; and (2) alleged noncompliance with the SMA.  Even so, at oral argument in this court, counsel for Protect led off by alluding to a number of other environmental concerns (e.g., landslides, previous use of the property for oil drilling) that were not raised in its briefs. But as this court noted in *Katelaris v. County of Orange* (2001) 92 Cal.App.4th 1211, 1216, footnote 4, "an issue is waived when not raised in appellant's opening brief."

## DISPOSITION

The order is affirmed.  Respondents shall recover costs on appeal.


THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


IKOLA, J.